IN THE MATTER OF JOSEPH A. PENNICA,
AN ATTORNEY-AT-LAW.

Argued January 10, 1961 and November 8, 1961—
Decided January 22, 1962.

*Mr. Cuddie E. Davidson, Jr., Mr. George F. Hetfield* and *Mr. H. Harding Brown* argued the causes for the Ethics Committee of Union County.

*Mr. Edmund J. Kiely* argued the cause for respondent.

The opinion of the court was delivered by

FRANCIS, J.   A number of charges of unethical conduct were filed against the respondent Joseph Pennica, Esq., who was admitted to the bar of this State in 1951.   Hearings were held thereon by the Ethics Committee of Union County. They resulted in three presentments to this court recommending disciplinary action against him.   We shall consider each

of them separately in the following order: (1) the Max Sacks Matter, (2) the Monmouth County Court complaint, and (3) the Bock Matter.

## I.

### THE MAX SACKS MATTER.

This accusation arose out of the forgery of the signature of Sophie Sacks, wife of Max Sacks, on an application for a bank loan, on a note for the amount of the loan, and on the bank check for the proceeds of the loan. The Ethics Committee found that Pennica participated in the loan transaction and aided in its consummation, knowing of the forgery. The conclusion was reached after several hearings and study of a welter of conflicting testimony. Since the issue of credibility is paramount, our review necessarily calls for a thorough examination and evaluation of the lengthy record.

Pennica maintains his law office in Elizabeth, New Jersey. In the forenoon of April 26, 1957, John Serido telephoned him from Plainfield, New Jersey, and told him that he needed money to make good some checks he had issued. He indicated also that he had a friend with him whose credit would support a loan. Pennica suggested that they come to his office. Serido and Max Sacks, the friend referred to, both of whom lived in Plainfield, came to Pennica's office by automobile, arriving around 11 A. M. One Clement Approvato, Jr. drove the car. Everyone agrees that Serido and Sacks entered the office. There is a dispute in the testimony as to whether Approvato came in with them. Serido, Sacks and Approvato say that he did; Pennica denies it and asserts that the allegation of Approvato's presence both in his office and at the bank on the visits to be detailed, was not made until the controversy arose as to Pennica's course of conduct on that day.

Serido and Approvato had substantial criminal records. Serido had been convicted of fornication, armed robbery, a

narcotics violation, and some worthless check charges. He seemed to have a particular penchant for issuing bad checks and had a number of them outstanding "in quite a few towns" at the time of this call to Pennica. Pennica was aware of earlier worthless check charges against Serido because he had represented him in connection with some of them. Whether he knew of the complete criminal record does not appear.

A discussion took place about raising money to meet Serido's obligations in order to keep him out of jail. Without reciting the details, when it developed that Sacks owned a substantial property in Plainfield which would provide collateral, Pennica advised that he could assist Serido and Sacks in obtaining a loan at the Elizabethport Banking Company, the office of which was nearby. After persuading Sacks to apply for the loan, they walked to the Bank (Pennica denying that Approvato accompanied them; the others asserting it).

Pennica introduced Sacks to Charles J. Walker, Vice-President of the Bank, who handled loan transactions, and explained to him the desire for a $2,000 loan. Serido remained at a distance, not joining in the talk; Approvato said he remained outside. After some discussion, Walker gave Sacks and Pennica a loan application form and a note for $2,280 to be completed. Walker, Sacks, Serido and Pennica agree that Pennica went to a nearby desk with Sacks and filled in the application in ink with information obtained from Sacks about the Plainfield property, his business, income, etc.; Pennica's writing appears on three sheets of the application. The circumstances strongly suggest that he used his own pen in doing so. Then Pennica had Sacks sign the papers in the three places marked by Walker. Our attention is attracted to the ink used by Pennica and Sacks. It has an odd, almost purple hue. Among other things, Pennica had noted that title to the real estate was in Max Sacks and his wife, Sophie. The forms were handed back to Mr. Walker who, after examination, advised them that Sophie's

signature on the application and note was necessary as well as Max's. Following this, Sacks, Pennica and Serido left the bank, ostensibly to obtain Mrs. Sacks' signature.

At this point the crucial conflict of credibility begins. Sacks testified he advised Pennica that his wife would never sign because she neither liked nor trusted Serido. According to Sacks, Serido and Approvato, they then returned to Pennica's office. Further talk about the problem ensued there during the course of which Sacks reiterated his certainty that his wife would not approve the transaction. It is difficult to pinpoint the exact circumstances preceding the signing of Mrs. Sacks' name. It appears that in the course of discussion, Serido volunteered to write her signature on the papers. There is testimony to the effect also that Pennica suggested that Serido sign her name because he was going to pay the monthly installments on the note and no harm would be done. Serido assured Sacks that he would "go straight" and do his best to make the payments. Sacks finally agreed and Serido added Mrs. Sacks' signature in two places on the application and two on the note. Max Sacks' signature was already on the papers, having been written at the bank. Here again, we note that Sophie Sacks' four forged signatures were written with the same purple hued ink Pennica used in filling out the application. After waiting a while to allow sufficient time to elapse for a trip to Plainfield, all four men went back to the bank.

Pennica denies returning to his office and the events alleged to have happened there. Before the Ethics Committee he said that he handed the papers to Sacks, and told him to go to Plainfield and get his wife's signature. He instructed Sacks also to telephone him from Plainfield when Mrs. Sacks had signed, and then return to his office. The request for the telephone call was made because he did not trust Serido. Pennica's description of this scene is unusual. He said that after Walker requested Mrs. Sacks' signature and the documents were handed back, Sacks took them and "out he went." Pennica could not "keep up with

him. He was beginning to take off and I had to go out after him and then when I caught him I told him, 'Now, you'll have to go to Plainfield and get your wife's signature.' \* \* \* My recollection is that Mr. Sacks was going so fast that I wanted to tell him what Walker had said—to remind him not to forget what Walker told him about getting his wife's signature and to make sure that he understood this." After this conversation, he returned to his office alone.

Some time later, Pennica continued, Sacks and Serido appeared at the office. "Serido came running up first, and Mr. Sacks hardly got into the office when they told me Mrs. Sacks had signed. They said, 'Come on, let's go to the bank.'" In the criminal trial against Pennica, arising out of the forgery, he testified that they gave him the papers and, on seeing Sophie's name thereon, he said to Sacks: "Is this your wife's signature?" Sacks "assured" him it was. He did this because he wanted to be sure in his own mind, but he made no inquiry as to why they had not telephoned him from Plainfield. He then proceeded to the bank with them and submitted the application and note to Walker. In his testimony before the Ethics Committee he said he did not question Sacks about the signature at his office but that when they arrived at the bank, he asked Sacks whether the signature on the papers was his wife's.

A bank check for $2,030.73 was prepared by Walker and given to Sacks who, according to Pennica, wanted to cash it immediately. But (Pennica testified) he said: "No, you have to repeat the same process now. You have to now get your wife's signature on the check. He looked at it and I showed him where it was, I indicated to him. He said, 'Like we did before?' I said, 'That's right. Go back to Plainfield and get your wife's signature.'" Sacks was then to return to Pennica's office. The reason Pennica gave for asking Sacks and Serido to come back to his office was that he was doing a favor for them by arranging

the loan; he was not acting as the attorney of either one of them; and, as he did not trust Serido, he wanted to do what he could to see that the proceeds were used to satisfy the bad checks. In any event, shortly thereafter the two men reappeared at his office. Sacks said, "Here's the signature, here's the check signed."

Sacks, Serido and Approvato dispute Pennica's statements about the endorsement of the check. Serido and Approvato testified that when Sacks and Pennica came out of the bank, Pennica told Sacks and Serido to sign it. They did so (Serido again writing Mrs. Sacks' name) leaning on a nearby parked car, according to Serido; leaning against the wall of the bank, according to Approvato. Sacks was confused as to where the signing took place. These signatures are not in the purplish-tinged ink. Serido and Approvato said Pennica made an unsuccessful effort to cash the check at a store; Pennica denied it. Then they waited for some time and again walked to the bank to obtain the money.

At this juncture it is necessary to return to Pennica's version of the affair at the point where he said Sacks and Serido reappeared at his office with the signed check. He said they set out for the bank to cash it, but they walked "so fast, they were so far ahead of me that they got there before I even turned the corner from my office and I wasn't going to run with them as rapidly as they were." So he waited outside and soon Sacks came out with the money in his hands.

Almost as soon as Pennica, Serido and Sacks came together outside the bank, they all agree that a squabble broke out about the division or possession of the money. Serido insisted that it be given to him because he had the bad checks to make good. Sacks indicated that he had made arrangements with the holders of the checks and felt that he should be permitted to make the payments. But both of them testified, Serido at Pennica's criminal trial, and Sacks on that occasion and before the Ethics Committee

also, that Pennica got possession of the money and gave Serido a maximum of $800 to satisfy the checks. Serido and Approvato said the reasons assigned by Pennica for retaining the balance were that he had worked all day on the loan and because of some previous indebtedness of Serido to him. Pennica denied that he received any part of the money. He said that Serido was grabbing for the money; Sacks was trying to avoid giving it to him. He suggested an even division so that Sacks could pay off the checks held by persons with whom he had made arrangements to do so, and Serido could take care of the remainder. At Pennica's criminal trial he asserted that his suggestion was agreeable and he "divided the money among them and it was my recollection that they got a thousand dollars apiece." More particularly he said:

"\* \* \* Mr. Sacks had the money in his hand. Mr. Serido made a grab for all the money. Mr. Sacks wouldn't give him any of it. He was imploring upon me to make the division and to hold down Serido, not to give him all the money. I then divided it between them. I said, 'You claim you have personal people that have made representations to you that Serido owes them money. You take care of those,' and Serido claimed that he would take care of the balance."

Before the Ethics Committee, Pennica referred to the squabble between Sacks and Serido, and said that Sacks suggested that he (Pennica) be permitted to pay off the checks. But then "Serido grabbed the money and then I got my hands on some of it and I started to count it out and before you know it, it was grabbed out of my hands. Then Serido convinced Sacks to let him handle everything." In a statement given at a later time to the Prosecutor's representatives, Pennica described this incident as follows:

"\* \* \* Sacks and Serido went into the bank and they came to the sidewalk and they began to squabble about the division of the $2,000., saying, 'I have to make certain checks good,' and they took off and I cautioned Mr. Sacks, 'Make sure you pay off the checks with that money, that's what you got it for.'"

After the sidewalk incident, Sacks and Serido set out together, ostensibly to make the checks good. Pennica returned to his office.

Early in 1958, Pennica encountered Serido at the Somerset County Court House. Serido, then represented by other counsel, had pleaded guilty to a charge of forgery and was awaiting sentence. (This offense was not the Sophie Sacks forgery.) Apparently he had learned or suspected that he was going to suffer a jail term. On seeing Pennica, he asked him to take over the case for the purpose of obtaining leave from the court to withdraw the plea and go to trial. Pennica did so and the indictment was tried in February 1958. A conviction resulted, whereupon, according to Pennica, both Serido and Sacks threatened him before and after the sentence. Serido said he would get even because Pennica had lost the case. Sacks complained that Serido owed him a large sum of money and now he would not be able to collect it. The following is the kind of threat Sacks is alleged to have made:

"* * * Now you lost the case. You made Serido go to jail for 12 to 18 years and I can't get any of the money he owes me, and I am going to hold you responsible for it. And the loan I got at the bank, my wife's signature was forged, and I am going to say that you were the one who told us to do it and that you arranged everything for us to forge that signature, and I am going to get Mr. Approvato to also swear to the same thing that I am going to swear to."

Pennica said that particular threat took place early in 1958, around the time of the trial. The court record, of which we take judicial notice, shows that Serido's sentence of 12 to 18 years was imposed on May 2, 1958. Serido and Sacks deny the threats.

In this chronicle of pertinent events, reference must be made to Pennica's fee arrangement for the defense of Serido. Before the Committee, he said the charge was $4,500, most of which he received. After the conviction it was decided to appeal. But he was not a counsellor and could not handle

the appeal, and told Serido he would recommend a good lawyer to do so. He testified variously that he made the necessary arrangements with Bernard Folkenflik, Esq., that he recommended various attorneys, that Folkenflik was actually engaged by a friend of Serido's when the appeal was already pending. In any event, prior to the taking of the appeal, Pennica said that Serido complained to him about being left "high and dry" after a substantial fee had been paid for legal services. Pennica then suggested that if Mrs. Serido would call at his office he would give her $2,000 to help defray the appeal expenses. And he testified that this sum was paid to her. The date this was done cannot be fixed with any certainty from the record. In one place in the record he asserted the money passed long before Mr. Folkenflik's death in February 1959; at another, on questioning by the Committee, he said that on October 20, 1958, he withdrew $3,000 from his savings account and gave Mrs. Serido the $2,000 in cash.

At the criminal trial of Pennica, the account of the fee transaction was quite different. Prior to Pennica's indictment for conspiracy to defraud the Elizabethport Banking Company by means of Serido's forgery of Mrs. Sacks' signature, he had testified before the Grand Jury. On cross-examination at the trial of the indictment, it developed that in the Grand Jury appearance he testified he had obtained a signed retainer agreement on February 10, 1958, from Serido for "$2,100" (*sic*), $200 for work already done, and the balance to be paid in two installments of $1,000 each, the last one due prior to February 14, the date fixed for trial of Serido. The agreement specified that if the fee was not paid, Pennica would not appear in court on February 14. When the time came, Serido did not have the money. Then a friend gave Pennica a check for $1,800. It was returned for insufficient funds. Suit was started on the check and a settlement made. As the result of these difficulties, Pennica said to the Grand Jury, he received but $800 for his services at Serido's trial. The Assistant Prosecutor ques-

tioned his payment of $2,000 to Mrs. Serido, allegedly for appeal purposes, when he had received a total fee of $800, and intimated that the payment was made to influence Serido not to involve him in the Sacks forgery. Pennica rejected the suggestion and gave an explanation, which had not been given to the Grand Jury. He said he had been handed $2,000 to prosecute an appeal on the day the jury convicted Serido in Somerville. Specifically he testified:

"Q. Tell us when you received the $2,000 to prosecute the appeal. A. The day the jury came out with a verdict against my client. He then got me in a corner and with me was one of my associates, and he explained to me, 'Now I have to take an appeal. Here is $2,000. Take care of the appeal.' And that is how he gave me the money for the appeal. * * *."

Although reference has already been made to some of the many conflicts and bizarre statements in Pennica's testimony which reflect upon his credibility, this obviously *ad hoc* assertion strains credulity beyond the breaking point.

After Serido went to prison, Pennica visited him many times and discussed the appeal with him. The Appellate Division file shows that on June 9, 1958, Serido made a *pro se* application for leave to appeal as an indigent. Such an order was granted. Serido then filed a notice of appeal *pro se* on July 10, 1958. Subsequently he applied for, and was given, a transcript of the testimony at the trial, also as an indigent. On April 17, 1959, again on a similar request, the Appellate Division assigned counsel to perfect and argue the appeal for him. The conviction was affirmed on September 22, 1959. The record reveals also that on February 2, 1959, Mr. Folkenflik presented an application for bail for Serido pending the review. It was denied. That was his only appearance on the appeal.

Serido testified that Folkenflik represented him on the conspiracy indictment referred to above, under which he was a codefendant with Pennica. He said also that Folkenflik, who died suddenly on February 21, 1959, was working on

the appeal from the Somerset County forgery conviction. However, the date when representation on the appeal began was not given. Among other things, Serido did say he gave Folkenflik the whole story of the Sacks forgery. This is not without significance in the present proceeding because Pennica told the Ethics Committee he first learned from Folkenflik that something was "stirring" in the way of investigation of the Sacks case, and that the information prompted him to obtain the statements from Sacks (which are to be discussed hereafter). It seems obvious that Folkenflik had detailed knowledge of the situation, at least as Serido described it, because Pennica said: "He went into this thing like he was with me when it happened." The inference is strong that the information came from Serido.

One of the odd circumstances to be appraised is Pennica's almost ambivalent discussion of Folkenflik. At one place in his testimony he said, "Bernie was a very dear friend of mine. He lived a block from my home." Later, when a member of the Committee suggested that Folkenflik was a good friend of his, he answered:

"No, he wasn't a good friend of mine. I didn't know Mr. Folkenflik very well. I knew him as I know you and as I know fellow members of the bar. I never was out with him socially. I only would know Mr. Folkenflik if I met him in a court room. * * *."

Again, in another part of his testimony, he said that after Folkenflik took over the prosecution of Serido's appeal, Serido "didn't like that I recommended Folkenflik and he didn't trust Folkenflik and he thought that Folkenflik was going to sell him down the river and he was always writing to me. I had to go down [to the prison] and assure him that he was all right, that he was a good lawyer and that he would do the right job for him."

Pennica made a number of assertions about hearing rumors from various sources concerning his alleged involvement in the criminal aspect of the Sacks bank matter. It

is impossible, however, from his testimony to pinpoint with any degree of certainty the dates and time sequence in relation to Serido's trial in Somerset County. On being asked if he discussed the forgery of Mrs. Sacks' signature with Serido in the prison during the conversations about the appeal, he replied that it was unnecessary as he knew Serido had done it. Clearly, he had information in June 1958 about activity in the matter by the Union County Prosecutor because he telephoned a Prosecutor's detective, Robert Ward, at his home to ascertain what was going on. Moreover, he admitted knowing prior to October 11, 1958, that Detective Ward had interviewed Walker, the Elizabethport Bank officer. But he asserted that he was not aware prior to October 11 that Sacks or Approvato had been contacted by or given statements to the Prosecutor's office. Later in his testimony, when being questioned as to why he did not wish to give to Ward certain statements he had obtained from Sacks on and after October 11, 1958, he said:

"I didn't have any confidence in him. I didn't know who he was or what he was trying to do. All I know is he was stirring up Approvato. I knew he was stirring Sacks. I knew he had made four, five, six or seven trips down to Approvato, and he went to Sacks. He was seeing everybody. He went to Trenton to speak to Serido and all he said to Serido was that we want to get Pennica. We don't care about you. We would like to get Pennica. Now, that's what Ward said to people and it came back to me. Whether I believe it or not is another question, but I didn't see fit to trust him."

Some of the rumors were to the effect that Sacks was saying that Pennica was involved in the forgery. So, early in October 1958, Pennica telephoned him and inquired about it, to which Sacks replied, "Why, I never said anything like that about you. You are a fine man." Pennica testified he then asked if Sacks would come into the office and make a statement to that effect; whereupon Sacks said he would do so if Pennica paid him $2,280 (the exact amount of the forged note). At Pennica's suggestion, he and Sacks met a few days later, in the evening, in front of the

Plainfield Courier News building. They sat in Sacks' parked truck and discussed the matter. Sacks said that Serido got all the money from the bank loan and since he was in jail and unable to meet the installment payments, Sacks had to make them. Therefore, he wanted the money from Pennica and if not given to him he would say Pennica engineered the forgeries of his wife's signature. Pennica agreed to pay at his office on the following Saturday afternoon, October 11, 1958, providing the exonerating statement was furnished.

The conflicting accounts which are present throughout the case again appear on this aspect of it. Sacks denies making any such demand. He said Pennica telephoned and asked to meet him at the building mentioned. He went there and Pennica offered to repay the full amount of the note if Sacks "kept on his side 100 percent." He accepted because he wanted to get his money back, and arrangements were then completed to meet at Pennica's office on the date mentioned above. Sacks testified that he had already been to the Prosecutor's office about the forgery, and that he returned there on Saturday morning to disclose the information about the meeting. In our search for guidance in the jungle of contradictions pervading the record, we cannot overlook that counsel for Pennica, in cross-examining Sacks, said:

"Q. No matter what you say, I don't think you would tell a lie.
A. Thank you for the compliment.
Q. We have known each other for a good many years.
A. You know my mother-in-law, too."

The meeting took place as scheduled. Prior thereto Pennica had drawn $1,780 from the bank to provide the cash. This amount, rather than $2,280, was provided because he intended to use the sum withheld as bait for additional statements. Without setting out all of the details, it seems sufficient to say that Sacks gave a written and sworn statement exonerating Pennica of participation

in or knowledge of the forgery of Mrs. Sacks' name, and reciting that Serido signed her name after Pennica had sent them to Plainfield for the purpose of obtaining her signature. Some of the incidental facts surrounding the transaction were falsely stated in the affidavit, to the knowledge of both of them. For example, included was the assertion that Pennica's only participation was the first visit to the bank when the loan application and note were made out, and that after Sacks and Serido were dispatched to secure Mrs. Sacks' signature, they did not again see him on their later visits to the bank to complete the transaction and obtain the money. Pennica admits he went to the bank with them three different times.

On being paid the $1,780 for the statement, Sacks reported to the prosecuting authorities where the numbers of the bills were noted.

A short time later, the two men met again in Pennica's office and, on payment of an additional $400, Sacks agreed to make a second statement, again exonerating Pennica. This was done in the office of the real estate broker where the affidavit on the first statement was taken. The version of the loan transaction remained essentially unchanged; some references to Serido's large indebtedness to Sacks prior to the forgery were excised. Again Sacks reported the incident to the Prosecutor and the numbers on the bills were noted.

On October 30, according to Pennica, Sacks telephoned about the remaining balance of $100 to make up the total of the note, $2,280. They met in Plainfield and Pennica requested another statement which Sacks consented to make, on being told that the second one would be destroyed. Pennica said he tore up the second statement in Sacks' presence and they then revisited the same real estate broker's office where a third affidavit was drawn and sworn to. This one, also reciting that Pennica had no knowledge of the forgery, was very similar to the first statement, and (without regard to the forgery aspect of the matter) contained

416

some of the same assertions of fact which they both knew were untrue. Pennica paid the final $100, and again Sacks reported the numbers on the bills to the police.

Pennica advanced a number of reasons for buying the three statements for the face amount of the $2,280 note. He wished to prove to the Prosecutor's office that Sacks (1) was extorting money from him, (2) would say anything for money, and (3) that he was an unreliable witness. Moreover, Pennica wanted to forestall a possible indictment of himself based on Sacks' testimony. The Prosecutor's office was not advised of Sacks' alleged extortion attempt before the money was paid, because Pennica did not have confidence in the office. He felt he would get neither cooperation nor consideration from that source, and so he decided to be his own investigator. And he paid the $2,280 to Sacks in cash rather than by check because of a fear that if he followed that course Sacks might feel the check would be evidence of the extortion, and refuse to give the statements. Further, he intended to turn the statements over to the Prosecutor after the completion of his own investigation, which was to include an effort to obtain an affidavit from Approvato also, who he thought had been making telephone calls demanding money under threat of exposure in the same matter. This phase of the case cannot be left, however, without reference to Sacks' motivation in going to the police in the first place. He testified that he had nothing against Pennica, and that if he had known that he would be reimbursed for the full amount of the forged note, he would have "kept his mouth shut."

On October 31, 1958, Pennica visited the Prosecutor's office and gave a statement to Detective Ward and Assistant Prosecutor Leo Kaplowitz (which he swore to on November 7) about his part in the bank loan transaction in which he denied participation in the forgery or knowing about it when it happened. In addition, he furnished copies of the two Sacks affidavits which corroborated him. At the conclusion of the interview he said: "Mr. Ward, I think

you people have been very, very fair in this whole thing.
* * *."

Pennica did not know how to get in touch with Approvato. So he asked Bennie Grillo (the person who furnished the $1,800 bad check for the defense of Serido in Somerset County) to have Approvato telephone him. Thereafter, Grillo called Pennica and put Approvato on the telephone. Pennica inquired about the anonymous threatening calls and asked Approvato to come to his office to discuss them. That same evening Grillo and one Joseph Soroka drove Approvato to Pennica's office. There, according to Pennica, Approvato denied making or knowing about any threatening phone calls, and spreading any rumors about the bank loan. Thereupon, they shook hands and the meeting ended.

Approvato's version of the incident is different. At the office, Pennica told him to say he knew nothing about the loan and wanted him to sign a statement to that effect. He assured Pennica that he would never say anything about it. He testified further that Grillo and Soroka told him that if he did not talk he would get some money out of the "deal," otherwise "something might happen" to him. Pennica, Grillo and Soroka deny this conversation and the threats. At his criminal trial, although Pennica discussed Approvato's visit to the office, he said nothing about Grillo or Soroka accompanying him. He testified that he had a friend tell Approvato that he wanted to see him, and Approvato came.

As has been set forth earlier, Approvato has a criminal record: larceny, robbery, rape, and at the time of this hearing he was awaiting sentence on a plea of *non vult* to an indictment for passing bad checks. In addition, he had been a patient in some institutions for mental diseases, beginning in 1947 when he was in the Army in Germany. Apparently he had not had any treatment for mental disturbance for a substantial period of time before this appearance as a witness. Soroka, too, has a criminal record. The examination with respect to it was rather abortive, but

when asked if he had been convicted of crime, he said, "Well, I'd say two or three times; two felonies, I know that, sir."

Charles J. Walker, the bank officer referred to above, testified that on July 21, 1958, Mr. and Mrs. Sacks came to the bank to recast the $2,280 loan. Mrs. Sacks advised him of the forgery of her signature on the note and application. She was very excited about it. He did not question in detail, but after ascertaining that she and her husband were good credit risks, he did recast the loan and both of them signed a new note. The old one, bearing the forged signature, was marked "paid," but not returned. Obviously, Walker was aware at the time that the original transaction was under investigation because on June 10, 1958 he had been interviewed by a representative of the Prosecutor's office and had given a statement about the matter. He did not return the original note to the Sackses because the bank had orders from the Prosecutor to hold it "in reference to the coming case."

On November 25, 1958, following Pennica's visit to the Prosecutor, Pennica appeared before the Grand Jury. Shortly thereafter, he and Serido were indicted for conspiracy to defraud the bank by means of the forgery of Mrs. Sacks' signature. Pennica alone stood trial on the indictment before the Union County Court and a jury in March 1959; an acquittal resulted.

Acquittal of a member of the bar following trial of a criminal indictment is not *res judicata* in a subsequent disciplinary proceeding based on substantially the same charge or conduct. *In re Barach,* 279 *Pa.* 89, 123 *A.* 727 (*Sup. Ct.* 1924) ; Annotation, 123 *A. L. R.* 779, 780–86 (1939) ; 5 *Am. Jur., Attorneys at Law,* § 283; *Drinker, Legal Ethics* (1953) 37; and *cf. Borough of Park Ridge v. Salimone,* 36 *N. J. Super.* 485, 498 (*App. Div.* 1955), affirmed 21 *N. J.* 28, 39 (1956). Not only are the parties different but the purposes of the two proceedings are different. In the disciplinary matter, the primary purpose is not to punish an offender; it is to protect the public

against members of the bar who are unworthy of the trust and confidence essential to the relationship of attorney and client; it is to ascertain whether the conduct of the attorney involved has demonstrated his unfitness to practice law, and if so to deprive him of his previously acquired privilege to serve as an officer of the court. *In re Introcaso,* 26 *N. J.* 353, 360 (1958); *Drinker, supra* 37. Moreover, the *quantum* of proof required to warrant discipline or disbarment is different from that demanded for conviction of a criminal charge. The proceeding is not criminal in character; it is *sui generis,* stemming from the inherent power of the court to regulate the practice of law and the admission of persons to engage in that practice. *In re Ries,* 131 *N. J. L.* 559 (*Sup. Ct.* 1944); *In re Samuel Davies,* 93 *Pa.* 116, 121 (*Sup. Ct.* 1880). But it is essentially civil in nature. Because of the dire consequences which may flow from an adverse finding, however, we regard as necessary to sustain such a finding the production of a greater *quantum* of proof than is ordinarily required in a. civil action, *i. e.,* a preponderance of the evidence, but less than that called for to sustain a criminal conviction, *i. e.,* proof of guilt beyond a reasonable doubt. Although the specific rule has not been articulated previously in this State, we declare it to be that discipline or disbarment is warranted only where the evidence of unethical conduct or unfitness to continue in practice against an attorney is clear and convincing. See *In re Noonan and Simpson,* 65 *N. J. L.* 142 (*Sup. Ct.* 1900); *In re An Attorney,* 175 *App. Div.* 653, 161 *N. Y. S.* 504 (1916); *San Francisco Bar Ass'n v. Sullivan,* 185 *Cal.* 621, 198 *P.* 7 (*Sup. Ct.* 1921); *In re Lemisch,* 321 *Pa.* 110, 184 *A.* 72 (*Sup. Ct.* 1936); *In re Morford,* 46 *Del.* 144, 80 *A.* 2d 429 (*Sup. Ct.* 1951); 5 *Am. Jur., Attorneys at Law, supra,* § 295; *Drinker, supra* 46.

In this case, after a long hearing and full consideration of the evidence, the Ethics Committee found that before the proceeds of the loan were obtained from the bank,

Pennica knew that Sophie Sacks' signature had been forged to the loan application, note and check; that he knew that Mrs. Sacks would not sign or consent to the transaction; that he knew the bank would not grant the loan without her signature; that his denials of participation in the perpetration of the forgeries and of receipt of any part of the proceeds were unworthy of belief. A finding was made also that he had paid $2,280 to Max Sacks to obtain exculpatory affidavits, knowing that they contained false facts.

In the recital outlined above, we have endeavored to set down the undisputed facts as well as the basic testimonial conflicts which had to be resolved. In reaching our own ultimate conclusion, we were not unmindful of the acquittal in the criminal case. As we have already said, that fact is not dispositive of the charge of professional misconduct. Aside from the difference in the nature of the two proceedings and in the rules with respect to the burden of proof, our inquiry is not limited to the issue presented by the indictment, *i. e.,* whether Pennica was a party to the criminal conspiracy specifically charged against him. Our study is to ascertain whether he knowingly participated in the forgery transaction and in its fruits in such fashion as to demonstrate clearly and convincingly that he is unfit to engage further in the practice of law.

The characters who occupied the principal roles in the entire event before us make difficult the search for truth. The criminal records and the obviously limited mental capacity of some of them call for critical appraisal of their testimony. But their sworn statements cannot be disregarded if they have clear support in the light of the entire proof.

No one disputes that Mrs. Sacks' signature was forged on the loan application, note and check. Pennica filled out the application at the bank with the distinctive colored ink, described above, and Sacks affixed his signature in two places on the application and in one on the note in the same ink. When this had been completed and they were informed that

Mrs. Sacks' signature was necessary, if Pennica's only interest in the matter was to help out or to accommodate Serido and Sacks in their effort to raise money to meet Serido's bad checks, there was no need for him to participate further. Sacks' credit had been approved. All that remained to be done to obtain the agreed sum was to have Mrs. Sacks sign and return the papers to the bank.

We are satisfied, however, from all the circumstances, including the unexplained obvious use of the same ink for Sophie's four signatures, that Serido, Sacks, Approvato and Pennica went back to Pennica's office and there agreed, with Sacks' approval and Pennica's advice and approval, that Serido should write Mrs. Sacks' name. It is not necessary to decide whether Pennica or Serido first suggested the signing; it is enough that the three men agreed upon it and presented the forgeries to the bank to consummate the loan. Pennica's description of his over-cautious emphasis to Sacks and Serido of the need to go to Plainfield for Mrs. Sacks' signature, and his running after them to repeat the admonition, falls far short of the ring of truth. The same comment may be made with respect to the two subsequent visits to the bank. Pennica's testimony about his repeated questions as to whether Mrs. Sacks had signed the loan application and the note, and later the check for $2,030.73, impels the same conviction of untruthfulness. Nor can we accept as believable the reason he advanced for his second and third visits to the bank, i. e., that he did not trust Serido and wanted to be sure that the proceeds of the loan were used to satisfy the bad checks. There does not seem to be any doubt that after the money was received a dispute occurred outside the bank about its division. Sacks, Serido and Approvato cite Pennica as the cause of the difficulty because he took most of the money allegedly for his efforts in effectuating the loan. Pennica said Sacks and Serido were disputing as to which of them would disburse the fund. The precise origin of the trouble, or the portion of the money taken by Pennica does not require determination. We are satisfied, however, as

was the Ethics Committee, that Pennica came into possession of some part of the money during that discussion.

A factor strongly persuasive of Pennica's complicity in the illegal transaction is his repayment to Sacks of $2,280, the full amount of the note. The events which culminated in that significant action were set in motion by him. He knew long before his telephone call to Sacks that the forgery was under investigation. Mrs. Serido had already been given $2,000 under the unusual circumstances outlined earlier in this opinion. He alleged it to be a rebate of part of the fee paid to him to defend her husband on the Somerset County forgery trial. But when his Grand Jury testimony with respect to the amount of his fee made that position untenable, he said the $2,000 had been handed to him in the courtroom by the impoverished Serido immediately after the jury had convicted him of forgery, for the purpose of taking an appeal. Every reasonable inference points to that claim as an incredible improvisation, and generates the strong suspicion that the payment came from his own funds and that the motive was more self-serving.

In any event, the circumstances surrounding the Sacks' payments clearly support the view that they were the product of guilty consciousness, and an effort, as Sacks said, to obtain his support if prosecution against Pennica ensued for the forgery. The evening meeting in Sacks' truck in front of the Plainfield Courier News building, the failure to enlist support of the police or prosecutor to expose the alleged extortioner, the use of cash rather than checks in payment, and the payment of the full amount of the note, all denote that Pennica was buying exculpatory statements from a man who was only interested in reimbursement for the loss imposed by the forgery; a man who, according to his own statement, would not have turned in Pennica at all if he had known that the note was going to be taken care of in that fashion.

Although Approvato could not be considered a very reliable witness under ordinary circumstances, the evidence is con-

vincing that he had some connection with the events of the day of the bank loan. It is not essential to decide the extent of that connection. There is no doubt, however, that Pennica sent for him and endeavored unsuccessfully to obtain a helpful written statement from him. The effort, whether or not accompanied by threats of bodily harm or promises of money, fits into the pattern of defensive measures pursued by Pennica with Sacks and Mrs. Serido.

Our analysis of the whole record finds us in agreement with the Ethics Committee. The facts in the aggregate, and the fair inferences drawn therefrom, demonstrate clearly and convincingly that Pennica's denial of culpable and unethical connection with the forgery and its fruits is unworthy of belief. Our conclusion, which is predicated in major part upon Pennica's own testimony, was not reached lightly. Throughout the study of the facts we have been conscious that such a dereliction constitutes a most serious and flagrant disregard of the canons of professional ethics, and of the honor and integrity demanded of a member of the bar in the practice of law.

## II.

### The Monmouth County Court Complaint.

This complaint against Pennica charged that he misrepresented certain facts to the Monmouth County Court during the course of argument on an application in a criminal case for admission of his client to bail pending appeal. After hearing, the Ethics Committee of Union County found that the factual misrepresentations had been made, that Pennica was therefore guilty of unethical conduct, and more particularly of a violation of the principle of Canon 22 of the Canons of Professional Ethics. Canon 22 requires that the conduct of lawyers before the court should be characterized by candor and fairness. Accordingly, such a presentment was submitted to this court for consideration.

The charge against respondent arose under an unusual set of circumstances. His client had been convicted of performing an abortion. He had not represented her at the trial but had been called into the case by her family for purposes of prosecuting an appeal. She had been incarcerated upon conviction, and notice of appeal had not yet been filed. Since it was considered advisable to make an application for release on bail pending appellate decision, respondent obtained a substitution of attorney and the file from the office of trial counsel. The file contained trial counsel's notes, a transcript of the testimony of certain witnesses, and of the prosecutor's summation, and a memorandum prepared by trial counsel in support of a motion for a new trial. This file apparently represented the source of Pennica's information as to what happened at the trial.

The motion for bail was returnable on August 10, 1960. Argument began on that day and was continued to August 24 to enable the court to obtain and examine the entire transcript of the testimony. On both those days the County Court was operating under its summer schedule. The judge sitting was not the one before whom the case had been tried. The trial judge was on vacation. The assistant prosecutor, who appeared for the State, had not participated in the trial; that person was on vacation. The prosecutor's file did not contain a transcript of the testimony. No appeal had yet been taken, and so there had been no occasion to have the record transcribed. It was in this rather virgin territory that respondent made his application for bail.

In order to obtain release on bail pending appeal, a defendant must show that the case involves a substantial question which should be determined by an appellate court. *R. R.* 1:4–4.

Almost at the outset of the argument on August 10 the court advised respondent that he knew nothing about the case and was totally unprepared. Whereupon Pennica replied that he could inform the court by oral argument and demonstrate by reference to the facts that a serious ques-

tion existed as to whether the trial judge should not have granted the defense motion for a judgment of acquittal. This inquiry followed:

"The Court: Would it not be necessary for me to read the entire transcript before I could make a determination as to whether or not the State presented a *prima facie* case?

Mr. Pennica: I have that portion of the transcript applicable to this particular point to advise and inform your Honor that there is a substantial question that would have to be passed upon by the Appellate Division. What I have done, your Honor, *I have cut down* the amount of the transcript which your Honor would need to read in order to arrive at the conclusions which I respectfully propose to your Honor * * *." (Emphasis added)

Respondent then proceeded to advise the court and to argue that the proof of the State showed only a self-induced abortion and no proof sufficient to make a jury question that the defendant had used any instruments on the victim for the purpose of causing an abortion. After some discussion the court said he would reserve decision on the point until he could read the entire transcript of the State's case.

Respondent then presented another ground on which he relied, *i. e.,* that the Prosecutor had made improper, inflammatory and prejudicial remarks in his summation to the jury. Particularizing, he said the Prosecutor had referred to an alleged attempt on the part of the abortee and her husband to blackmail the defendant into paying them $20,000 in return for which they would appear before the Grand Jury and tell the "truth." And he asserted that there was no testimony or reference by counsel for the defendant at the trial to a blackmail attempt. Determination of this ground was also continued to August 24. On that day, in the same connection, the following took place:

"The Court: Did Mr. Juska make any reference to a blackmail of $20,000 or $10,000?

Mr. Pennica: No, your Honor.

The Court: Not during the entire trial?

Mr. Pennica: No."

Thereafter, Pennica indicated that there had been some discussion in chambers between the Prosecutor and Mr. Juska, defense counsel, before the trial began, about a "shakedown," and that this was done to eliminate any testimony on that subject. In the course of his statement he said, "* * * there was no testimony with reference to this $20,000 or reference to Mr. Juska's position." And the court asked:

"The Court: And no statement made by Mr. Juska in his opening? Mr. Pennica: No, sir, no, your Honor."

And later:

"The Court: Do you represent to the Court that Mr. Juska in his opening made no reference to the blackmail, the $20,000 blackmail? Mr. Pennica: Yes, sir."

Pennica was then asked if he had the transcript and on answering in the negative, the court inquired further as to how then he could make the representation. He replied that he had Mr. Juska's notes (which apparently did not show one way or the other that Juska had referred to the matter of blackmail in his opening). He based the representation also on the form in which Juska had voiced an objection to the Prosecutor's summation at its conclusion, which was to the effect that it was improper to refer to a conference had in the trial court's chambers before the trial began.

On this second day of argument of the matter the court had the transcript before him. From it he called respondent's attention to the very substantial evidence of the use of instruments by the defendant to induce the abortion. Pennica's explanation was that although the complainant had testified that defendant had inserted an instrument into her body, because of the position she occupied at the time she could not say that *the* instrument she saw in defendant's hand was inserted.

Further, the court pointed out from the transcript that Mr. Juska had specifically referred in his opening to the jury to an alleged conversation between complainant and her husband and the defendant in which complainant suggested she would go to the Grand Jury and tell the "truth" if defendant gave them $20,000. Pennica's explanation was that what he meant in his argument and answers to the court was that Mr. Juska had not used the word "blackmail" in the opening, and that the Prosecutor had used it in his summation. The use of that word, Pennica said, was the basis for his objection that the summation was improper and prejudicial.

At the conclusion of the argument the court denied the motion for bail. He also informed respondent of his feeling that deliberate misrepresentations had been made and that he intended to bring the matter to the attention of the Supreme Court. His subsequent letter addressed to the Clerk of this Court resulted in a reference for hearing to the Ethics Committee.

At the Committee hearing, Pennica's explanation for his conduct was that since he had not tried the case it was necessary to rely upon trial counsel's notes, memorandum of law and the partial transcript of the testimony, and to draw the inference therefrom that seemed justifiable. He insisted that he did not willfully make misstatements with intent to deceive the court. When a Committee member asked why he gave such unequivocal answers to the court, he said:

"I say, you ask me this question, 'Why do you say so and so, so definitely? You haven't read the transcript.' Here's how: When the question struck me, it hit me immediately about this meeting in chambers, that they had an agreement, that they decided what to do. And it was my conclusion that they decided not to mention blackmail. That's how I got into that trap. It wasn't that I set out to do all this, set out to plan, the fact of blackmail.

When I began to substantiate my position before Judge Simmill, I hadn't the transcript to use; I didn't have anything. But I relied on my intuition as a plaintiff's attorney, that no plaintiff attorney

would use the word blackmail in an opening. And I took a stand. Why did I take such a stand? I wanted my client out on bail, and I wanted her to be afforded due process of law, and I wanted to be sincere and honest with the Court.

I had nothing before me and the Prosecutor didn't say anything. He was standing beside me. Then it was when he came around to the fact of the $20,000 blackmail thing, I didn't make it to mislead the Court or to change anything; it happened in our argument as I was on my feet."

Another member inquired as to whether he would have prejudiced his client's application if he had told the court that since he had not seen the full transcript he could not be certain about his representations. He replied that it would have, because then the court would probably have suggested waiting for the full transcript and "it would have meant a delay for my client who was sitting in jail."

The Committee found that Pennica had made misrepresentations to the court but they believed his testimony that he did not willfully and deliberately set out to make them. Their finding was that he made them recklessly to serve what he considered to be the interest of his client; that he made them because he lacks the moral sensibility which an attorney should possess, and that he was and is wholly unaware that his conduct before the County Court was improper and unethical. They finally concluded that whether Pennica's actions were intentional or unintentional in character, or resulted from being "unschooled or unprincipled," he was guilty of departure from the standard of ethical behavior which must be observed by a member of the bar.

█ A lawyer's responsibility partakes of a double character. He owes an obligation of fidelity to his client, but he also owes the duty of good faith and honorable dealing to the judges before whom he practices his profession. *People ex rel. v. Beattie*, 137 *Ill.* 553, 574, 27 *N. E.* 1096, 1103 (*Sup. Ct.* 1891). The importance of being absolutely fair with the court cannot be overestimated. In the ever present search for truth, judicial tribunals must have the right to rely upon the frank assistance of members of the bar. To

the extent that the right is not respected, the worth of the historic partnership of bench and bar in that quest must decline.

Our study of the record satisfies us that the Committee's appraisal of Pennica's conduct was sound. His attitude before the County Court reveals a reckless indifference to the need for knowledge of facts before they are advanced as truth in a judicial proceeding. Moreover, his rationalization before the Committee of the course he pursued demonstrates devotion to the philosophy that the end justifies the means. Such conduct and attitude are not consistent with the true art of advocacy; they constitute a perversion of it which cannot be permitted to exist if the legal profession is to be worthy of the esteem of the public.

## III.

### THE BOOK MATTER.

A complaint was filed with the Ethics Committee by Walter H. Bock charging Pennica with making misrepresentations and exercising undue influence in order to obtain fees from him in excess of their written retainer agreement. Four members of the Committee declared the accusation to be well-founded, and presented the matter to this court for disciplinary action. Two members dissented, saying that although they found Pennica did induce Bock to make additional advancements, in their opinion undue influence had not been shown by clear and convincing evidence.

The factual background of the complaint may be stated briefly. Bock felt that he had a justifiable claim for libel against a Union County newspaper. Prior to meeting Pennica, he had been unsuccessful in obtaining the services of an attorney to bring an action for him. In May 1956 he consulted Pennica, who, after reading the newspaper item and discussing the matter with him, was enthusiastic about it and said he considered the prospect of recovery to be excellent. A written retainer was prepared and signed, in

which respondent agreed to institute suit on a 30% contingency basis. Bock was to pay (and did pay) a retainer of $1,000 which would be applied against Pennica's share of any settlement or judgment.

A complaint with an *ad damnum* clause of $500,000 was filed. Bock was upset about the size of the demand, fearing further publicity which might make him look ridiculous and might add to the embarrassment and humiliation to which the alleged libelous article had already subjected him. He asserted that he became reassured when told that two settlement offers, one for $5,000 and one for $6,500, had already been received and rejected. Pennica denied making any such statement. It is undisputed that the newspaper never made the offers.

A few weeks after the retainer agreement was executed, the newspaper took Bock's deposition. Bock then insisted that counter depositions be taken of the defendant's witnesses. This was followed by a request for a different fee arrangement. During the discussion of the matter, Bock alleges among other things that Pennica asked him, "Do you want me to throw the case up?" Around the middle of June 1956 a new contract was made under which the cash retainer was increased to $2,500 (Bock paying an additional $1,500) and the contingency percentage was reduced from 30% to 20%. Pennica testified that the suggestion of modification of the original retainer was made because Bock's deposition did not support his damage claim as well as expected, and because he was proving to be a difficult, time-consuming client. He was visiting the office frequently, constantly writing letters about his case, and demanding actions such as the taking of defendant's witnesses' depositions, which Pennica, apparently, had not intended to do.

In early September 1956 an additional cash retainer of $2,000 was requested. Bock said there was no apparent reason for it. But Pennica testified that Bock's continued difficulty as a client motivated it in part; further, that Bock, himself, expecting a large recovery, desired elimination of

the contingency arrangement, and finally that he (Pennica) felt he was entitled to additional money in anticipation of the work to be done on the anticipated appeal from an adverse summary judgment. In any event, a third written agreement, dated September 4, 1956, was drawn. Under it Bock paid the additional $2,000, thus bringing the cash retainer to $4,500, and the contingency bargain was cancelled. The revised pact bound Pennica "to take the case to the court of final jurisdiction, the Supreme Court, if necessary," and there were to be "no further fees, charges or costs in this matter." This was "the final and last payment."

Pennica's reference to the anticipated work on appeal from a summary judgment against Bock, as a basis for the request for the $2,000, did not escape the Committee's attention. One member pointed out that the newspaper's motion for summary judgment was not made until November 8, 1956, and the decision thereon was not rendered until December 5, 1956. Thereupon Pennica engaged in the kind of *ad hoc* improvisation which characterized the Sacks and Monmouth County Court complaints. Witness:

"Q. Mr. Pennica, the record shows very clearly that the motion for summary judgment was made in November and an appeal taken in December?
A. I understand that.
Q. How could you possibly have anticipated on September 4 that the defendant would make a motion for summary judgment and that there would be an appeal?
A. Well, there was discussion back and forth between Mr. Sachar and I about the summary judgment. I knew that he would be successful from my knowledge of the case. I knew that when I came back from making the depositions."

But in the earlier part of his direct testimony he said his adversary's summary judgment idea

"caught me flatfooted. I didn't believe a summary judgment in this case would be applicable for my personal approach to this case. I was real close to it, and I felt that it was libelous *per se*, * * *."

432

A motion for summary judgment for defendant was made, and resulted favorably to defendant on December 5, 1956. It was reversed on appeal and the cause remanded for jury trial. *Bock v. Plainfield Courier-News,* 45 *N. J. Super.* 302 (*App. Div.* 1957). Thereafter and before the trial, according to Bock, Pennica asked him for additional sums. He claimed to have paid various amounts in cash at intervals, the total being $1,125, bringing his overall fee payments to $5,625. No receipts were given. Pennica denies asking for or receiving any of these cash payments. Bock's testimony on this aspect of the case is not clear as to whether any pressure was exerted to produce them. He said that although there was "perpetual begging" for further payments, he made them to stimulate what he felt was Pennica's flagging interest in the case. They represented an effort to "brace" him up, and he told Pennica no receipt was necessary.

Eventually jury trial of the libel suit was had. It resulted in a verdict for the defendant. Subsequent happenings are of no particular moment in this proceeding. It is sufficient to note that no recovery was ever made against the newspaper.

The majority of the Committee found that Pennica induced Bock to make additional fee payments to him by means of undue influence and misrepresentations, particularly with respect to alleged settlement offers, and assurance as to the value of the case. They declared that Bock impressed them with his demeanor and frankness, as well as with his straightforward account of his relationship with Pennica. They recognized that the issue presented was largely one of credibility, and they specifically proclaimed their belief of Bock and their disbelief of Pennica. Their final conclusion was that, after weighing the credibility of the witnesses, they would be remiss in their duty if they concluded that respondent's conduct was free from censure.

The minority members said they were "favorably impressed" with Bock's credibility, but felt there may have been "misunderstanding" between them as to whether Pennica was referring to actual offers of settlement rather than sums

for which he felt a settlement could be made. On the whole case they could not find clear and convincing proof of such undue influence as warranted disciplinary action.

Our review of the testimony indicates that Bock undoubtedly was an anxious, nervous and difficult client, who was deeply embarrassed by the unfavorable newspaper article, and who was most anxious for redress, as much in the form of vindication as monetary damages. The impression is inescapable that it was not very difficult to persuade him of the need for additional cash retainers, especially in the face of the optimism of his attorney as to the outcome of the litigation. His mental state made him unusually susceptible to such requests, and, like the majority of the Committee, we believe they were made, substantially under the circumstances described by him.

There is little doubt that if Bock's claim met with success at the trial in the form of almost any affirmative judgment, this complaint would not have been made. And his testimony at the hearing showed that if vindication from the disparagement of the newspaper article could be achieved in some way, even at that late date, he would not be interested in his charges against Pennica.

Our conclusion under the peculiar circumstances of the case is that the testimony demonstrates some improper overreaching on Pennica's part, running counter to the standard of morality and ethics required of members of the bar. If the dereliction stood alone, some measure of censure or disciplinary action would be warranted.

## IV.

### Conclusion.

As Justice Brennan observed in *In re Herr*, 22 *N. J.* 276, 300 (1956), "there is no profession, save perhaps the ministry, in which the highest morality is more necessary than that of the law." Membership in the profession is a privilege burdened with conditions. Some of the basic conditions are

good moral character, a capacity for fidelity to the interests of clients, and for fairness and candor in dealings with the courts. Those conditions are not only prerequisite for admission to the bar, they are equally essential afterward. Whenever they are broken, the privilege is lost.

When this court admits a person as an attorney, he is thereby held out to the public as worthy of confidence in all his professional duties and relations. In so presenting him, the court assumes a duty to guard the endorsement against misuse to the detriment of the public. If thereafter unworthiness to possess it appears, it must be withdrawn to protect the public and the administration of justice.

█ Pennica has been found wanting in his professional capacity on the three charges presented against him by the Committee of his associates at the bar. The record clearly and convincingly supports the adverse findings. The circumstances in their totality, but particularly those relating to complicity in the forgery of Mrs. Sacks' signature, have satisfied us that he is no longer worthy to bear our endorsement as a member of the bar. That conclusion leaves no alternative but disbarment. Accordingly, the name of respondent is stricken from the roll.

*For disbarment*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*Opposed*—None.