576 A.2d 889

IN THE MATTER OF STANLEY A. ROSNER, AN
ATTORNEY–AT–LAW.

Argued January 18, 1990—Decided July 27, 1990.

*Paula T. Granuzzo*, Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

No appearance was made on behalf of respondent.

PER CURIAM.

This proceeding arises from a complaint filed by the District IV Ethics Committee (Committee), charging respondent, Stanley A. Rosner, with violating *Rules of Professional Conduct*

1.2(d) and (e), 1.6(b)(1), 1.15(d), 4.1, and 8.4, and New Jersey *Rule* 1:21–6(a)(1). Two members of the Committee recommended disbarment and one member recommended suspension. The Disciplinary Review Board (DRB) found that the Committee's findings that respondent had been guilty of unethical conduct "are fully supported by clear and convincing evidence," and recommended a three-year suspension. We agree.

–I–

Respondent's conduct arose out of a real-estate transaction that occurred in 1986, shortly after he had retired from his employment as an attorney at CECOM at Fort Monmouth, where he had been employed from March 1980 until January 1986. He retired on disability because of "emotional problems, mostly depression, recurrent depression." Before the DRB, respondent asserted also that he suffered from both alcoholism and compulsive gambling.

After retirement, respondent met Nicholas L. Camerota, a real-estate developer, who hired him to conduct legal research at $10 per hour. Soon after, Camerota told respondent of his desire to hire him as his attorney in connection with a real-estate closing on a large parcel of land in Eatontown, New Jersey. The purchase price was $1,615,000, and the contract provided for Camerota to place $75,000 in escrow with respondent, to procure a mortgage commitment for $1,800,000, to apply for site-plan approval within thirty days of execution of the contract, and to begin test borings within forty-five days thereafter.

Respondent soon realized that he was unable to handle the transaction and so informed Camerota. Respondent did not maintain either a business or trust account, and told Camerota that he could not hold the deposit because of his alcohol and gambling problems. The contract, nonetheless, provided that respondent would hold all deposit monies in trust and would disburse payments for permits, architectural fees, test borings,

and other site improvements. Those provisions and Camerota's role as a svengali proved to be respondent's undoing.

### The DRB summarized the relevant facts:

In early March, Camerota purchased legal stationery for respondent. Camerota then prepared a letter to the seller's attorney for respondent's signature. The letter, dated March 19, 1986, acknowledged receipt and escrow of the $75,000 deposit. Bills which totaled $75,000 for alleged site improvements were also listed. Although respondent neither saw nor ever had possession of the $75,000 deposit, and had no knowledge of any site improvements, he signed the letter at Camerota's request. In return for this signature, respondent related the following promises from Camerota:

He said he would still be able to pay me the $20,000, plus he would set me up as a residential manager in the apartments as they were built to sell the apartments to potential buyers and I would get a commission on that so that would be another $20,000. He had told me at one point in time within a year or two I would be making a hundred thousand dollars working for him.

Shortly thereafter, respondent decided to terminate his employment with Camerota when one or two checks written by Camerota, representing payment of fees for respondent's research, were returned for insufficient funds. Respondent forwarded a handwritten letter to the sellers' attorney, advising that he no longer represented Camerota.

During his representation of Camerota, respondent's letterhead was being used by Camerota for "different litigations, different business transactions." In fact, respondent signed blank letterheads and gave them to Camerota to draft his own correspondence.

### He explained his actions as follows:

I did that on a couple of occasions. After he had read to me or told me the gist of what he was going to write [sic]. Then I found out it was being used for litigation. He asked me to sign several, on later dates, several letters of substitution and I did just to get out of it because I figured if worse came to worse [sic] I would just have to bring forgery charges against him and I didn't really want to do that. So I just signed substitution agreements to get out of it.

At one point, acting under what he claimed to be respondent's power of attorney, Camerota signed respondent's name either to correspondence or a legal document placing his initials, N.C., beneath the signature. Respondent contended that he never authorized Camerota to sign his name, although he testified that

... if he has a letter signed by me giving him any power of attorney to sign my name on toilet paper, it's one of those blank sheets I signed that he told me he would do something and then he gave himself power of attorney which, you know, would upset me a little bit. If he has anything in writing from me giving him power of attorney I was either drunk or else he forged—he wrote the stuff in afterwards and I—it's not what he told me he was going to write in.

The sellers of the Eatontown property thereafter filed suit to rescind the contract with Camerota and Campat Properties, Inc. A motion for summary judgment, filed by sellers, was then granted based on the defendant-purchasers' fraudulent conduct.

## In his written opinion, the judge stated:

It is clear that defendants failed to comply with the essential terms of the contract concerning deposit monies, a mortgage commitment and municipal approvals for the development of the property. In addition, defendants clearly used Mr. Rosner in an attempt to create the appearance that they were acting in accord with the terms of the contract.

Sellers' attorney subsequently filed this grievance. In proceedings before the District IV Ethics Committee, respondent submitted medical reports dated from 1983 and 1985. The various diagnoses included manic-depressive disorder, generalized anxiety disorder, and schizophrenia. Although treated with a variety of drugs, as of December 1985, respondent's condition had not stabilized. [Exhibit references omitted.]

## –II–

## The DRB accurately characterizes respondent's conduct:

Respondent's actions in this matter were outrageous. Respondent completely abrogated his responsibilities as an attorney when he signed blank letterheads for his client's personal use. While respondent claims that his client had told him what the letters would contain, this cannot in any way absolve him of his improper conduct, given the tremendous potential for harm, not only to respondent, but to other attorneys, members of the public, and the justice system itself. In allowing Camerota the freedom to use respondent's signature at will, in essence selling his license to practice law, respondent permitted Camerota to engage in the unauthorized practice of law, and to perpetrate a fraud on an unknown number of unsuspecting individuals.

Respondent again sold his license when he signed the March 19, 1986 letter drafted by Camerota, even though he knew the contents of that letter were false. His signature was given in return for Camerota's promise of a $20,000 fee plus greater financial rewards at a future date. The Board gives no weight to respondent's claim, in his letter of October 25, 1987, to the Committee investigator, that he acted out of fear of Camerota. While the argument may be convenient, the facts do not support respondent's claim. Only six months prior to that letter, in sworn testimony taken at a deposition, respondent testified that Camerota was like a father to him. Nowhere in that transcript does respondent suggest that his actions were taken out of fear for Camerota. To the contrary, the respondent's motivation—financial gain—is clearly demonstrated in the record. His actions resulted in a direct fraud to the detriment of another party, and reveal a complete lack of integrity. [Exhibit references omitted.]

Our review of the record leads us to conclude that the findings of the DRB are established by clear and convincing evidence.

Turning to the appropriate penalty, the Board unanimously recommended that respondent receive a three-year suspension, subject to certain conditions including production of medical proof of his fitness to practice law.

In some instances, fraudulent conduct justifies disbarment. *See, e.g., In re Pennica,* 36 *N.J.* 401, 177 *A.*2d 721 (1962) (attorney disbarred for complicity in forgery of signature on loan application, misrepresentations to court, and misrepresentations and use of undue influence to extract larger fee from client); *In re Stein,* 1 *N.J.* 228, 62 *A.*2d 801 (1949) (attorney disbarred for filing fraudulent divorce petition). Such conduct, however, has not compelled that result. *Compare In re Yacavino,* 100 *N.J.* 50, 494 *A.*2d 801 (1985) (attorney suspended for three years for mailing two false court orders to client to conceal his failure to pursue adoption matter) *and In re McNally,* 81 *N.J.* 304, 406 *A.*2d 1315 (1979) (attorney suspended for two years for forging sheriff's signature to foreclosure deed) *with Pennica, supra,* 36 *N.J.* 401, 177 *A.*2d 721, and *Stein, supra,* 1 *N.J.* 228, 62 *A.*2d 801.

Respondent's conduct involved neither a fraud on the court nor criminal conduct. His actions involved one client in a single transaction that took place within a short period of time. Although those considerations do not excuse his conduct, they serve to distinguish it from more egregious cases.

On balance, we are persuaded that the recommended three-year suspension is appropriate. We also agree that respondent should provide as a condition to reinstatement medical proof of his fitness to practice law.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

*For Suspension*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*Opposed*—None.

## ORDER

It is ORDERED that STANLEY A. ROSNER of LINDEN-WOLD, who was admitted to the bar of this State in 1979, is hereby suspended from the practice of law for a period of three years, effective August 10, 1990, and until the further Order of the Court; and it is further

ORDERED that respondent is restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that respondent comply with Regulation 23 of the Office of Attorney Ethics, governing suspended attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for all appropriate administrative costs, including the production of transcripts.