STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. PAUL KAVANAUGH, VINCENT KEARNEY, JR., HAROLD MATZNER AND DOROTHE KRUEGER, DEFENDANTS-APPELLANTS.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. VINCENT KEARNEY, JR., HAROLD MATZNER AND JOHN C. DE GROOT, DEFENDANTS-APPELLANTS.

Argued May 20, 1968—Decided May 29, 1968.

*Mr. F. Lee Bailey,* of the Massachusetts bar, and *Mr. Joseph T. Afflitto* argued the cause for appellants Matzner and Krueger.

*Mr. Bruno L. Leopizzi* argued the cause for intervenor Kearney and *Mr. Leonard I. Garth* argued the cause for intervenor De Groot (*Mr. Miles Feinstein,* on the brief; *Messrs. Cole, Berman and Garth,* attorneys for intervenor De Groot).

*Mr. Arthur J. Sills,* Attorney General of New Jersey, argued the cause for respondent (*Mr. Joseph A. Hoffman,* First Assistant Attorney General, of counsel and on the brief; *Mr. Elias Abelson,* Deputy Attorney General, on the brief).

The opinion of the court was delivered

PER CURIAM. This is an appeal from an order revoking permission theretofore extended under *R. R.* 1:12–8 to F. Lee Bailey, a member of the Massachusetts bar, to appear *pro hac vice* for defendants Harold Matzner and Dorothe Krueger in the first captioned matter and for defendant Harold Matzner in the second captioned matter. After the trial court entered the order, the defendants instituted a proceeding in the United States District Court for the District of New Jersey directly against the trial judge to restrain him from enforcing that order. The Federal Court concluded that defendants should exhaust their State remedy. Thereupon defendants sought leave to appeal which we

granted. The other defendants to the indictments were permitted to intervene.

The indictments are for murder. Two homicides are involved and the State contends they are related. The homicides themselves attracted an unusual amount of public attention. Interest was added when the defendants retained Mr. Bailey, a highly publicized lawyer. The problem of a fair trial emerged rather early. With that problem in mind, the trial court dealt with certain motions *in camera* so that there might not appear in the press matters which could interfere with the trial. Despite such precautions, the trial court found it necessary to order that a jury be selected from residents of another county.

In this setting Mr. Bailey circulated a letter which led to the termination of his privilege to appear *pro hac vice* in these cases. The letter, mailed from Boston, is dated April 24, 1968. The timing is significant. A special jury panel was to be drawn on May 10, 1968, the trial itself to begin on May 20 or June 3 (for present purposes it is not important which was the designated date when the letter of April 24 was mailed). Mr. Bailey's letter, addressed to the Governor of our State, reads:

"I am writing to call to your attention a matter which I consider to be of most serious consequence to the man I represent and to the State of New Jersey. I am about to commence a trial wherein the prosecutor presenting the case is fully aware that the only witness he has intends to lie and give a fully fictional account of a murder allegedly committed by my client.

Harold Matzner of Denville, New Jersey, was indicted in June, 1967 for the murder of Judy Kavanaugh and in October, 1967, for the murder of Gabriel DeFranco. I have represented him since the first indictment. I have never, in any state or federal court, seen abuses of justice, legal ethics, and constitutional rights such as this case has involved. It was apparent from the start that the 'witnesses' to each murder were persons utterly without human value. Both are convicts and both have been pressured or bribed by the prosecution to give their stories and thus knowingly jeopardize the lives of five completely innocent people, all of whom have been cleared by polygraph tests administered by nationally recognized experts.

One trial involves three defendants and one involves four: two, including my client, are defendants in both cases.

It was my original intent that the trial itself be the medium of exposing this disgraceful situation. However, some weeks ago, there suddenly appeared a special prosecutor in the person of James Dowd. It was apparent from our first encounter that this man was a very competent and also a very ethical lawyer. The DeFranco trial was scheduled for April 22 as a day certain. A week prior to its commencement, Mr. Dowd attempted to obtain a continuance to 'further investigate' the case with which he had become recently acquainted. I objected, and his motion was denied. Sensing that Mr. Dowd's purpose might serve some more noble value than the purposes of his predecessors, I conferred with him privately in the presence of his equally honest and competent assistant, Richard McGlynn. Upon his representation that, (1) he was in charge of the case, and (2) he had a sincere desire to determine whether or not his chief witness was a perjurer, I reversed my original stand and assented to a continuance.

Mr. Dowd was as good as his word. He did determine that Edward Lenney, the alleged eye-witness, had in fact offered a completely perjured story, and that he had been assisted in its concoction by officials of the State of New Jersey. Mr. Dowd wished that the indictment immediately be dismissed and the defendants be cleared of all suspicion. The defendants agreed. Before this could be done, however, representatives of the office of the prosecutor, John Thevos, made contact with Edward Lenney as a result of which he turned around once again and reverted to his false story. The State of New Jersey now proposes to go forward with this trial in order that those officials guilty of felonious conduct may be to some degree protected. My client, therefore, is offered the opportunity to fall into the classic American syndrome of the damnation of an acquittal. I do not propose that this should be allowed.

Should this trial proceed as is presently planned, the stench arising from it will hold the State of New Jersey up to ridicule such as has beset no organ of government since the abolition of Star Chamber. Although there would be a certain pleasure in bringing to book these officials in the spotlight of a murder trial, I believe it to be in the best interests of my client to urgently request that an immediate investigation be made to determine whether or not Mr. Dowd is being forced by orders from superiors to offer in an American courtroom a man he knows to be a complete and utter liar. The money and effort of which the taxpayers will be defrauded in such a trial could much better be spent in conducting the investigation that would lead to the disbarrment and incarceration of those responsible for this travesty.

The press has been throttled in this case to the extent that the public is almost wholly unaware of what is being perpetrated. As of the day our trial jury is sequestered, I intend that the entire matter be aired. I hope that some action on your part will precede such an unfortunate event. Thank you very kindly for your attention to this matter."

The press had the letter even before it reached the Governor's office,[1] and it received press coverage beginning on the 25th. On the 26th, the Governor's office advised the Chief Justice of the receipt of the letter.

We considered Mr. Bailey's letter at our conference on April 30, in the exercise of our administrative responsibility. We thought it fair to infer that a letter on Mr. Bailey's letterhead, widely published and not disavowed by him during a period of five days, was probably written by him. At the hearing below Mr. Bailey sharply questioned our basis for that inference, but before us he conceded that our judgment in that regard was not rash. As to the content of the letter, it seemed to us, in the absence of some extraordinary explanation, to bespeak inescapably a purpose to reach the public domain. The professed object was to induce the Governor to intercept an imminent trial by conducting some kind of an inquiry wherein he would necessarily adjudge the very issue involved in the trial of the indictment. We could understand a layman laboring under some such misunderstanding of the processes of government, but every lawyer has to know the judiciary exists precisely to discharge that function of government, and indeed that no other process of government can match the judicial process in its capacity to resolve a disputed issue of fact.

Hence, barring some explanation beyond our power to anticipate, Mr. Bailey's purpose had to be to reach prospective jurors. Upon that view, it is hardly necessary to spell out the gross improprieties of that brash document. Yet the closing paragraph deserves special mention, for it tells the reader that more is to come. The prospective jurors are thus informed that while they, sequestered, are fed evidence the prosecution has concocted, the rest of the world will be receiving the untarnished truth from Mr. Bailey. If so to read the last paragraph should seem extravagant, still it had

---

[1] At the hearing below Mr. Bailey said:

"* * * Before the certified letters reached their addressees, the news media had the letter. I haven't the vaguest idea how."

to mean at a minimum that while the trial is on, Mr. Bailey will make releases to the public of things which cannot be shown in the courtroom. That promised spectacle of course would be intolerable.

For these reasons we concluded that, wholly apart from future disciplinary proceedings, Mr. Bailey's permission to try these particular cases had to be questioned. Absent some explanation, or some equity in the clients, we were satisfied the letter itself constituted a *prima facie* basis requiring the revocation of leave granted him. Rather than issue an order returnable before us, we sent the matter to the trial court, there to afford Mr. Bailey and his clients a hearing wherein they could show cause, whatever it might be, why the permission given to Mr. Bailey to appear in these cases should not be rescinded. We therefore sent the following directive on April 30 to Judge Gordon H. Brown, the judge to whom the indictments had been assigned for trial:

"The Court, on the basis of a published letter from F. Lee Bailey, Esquire, to Governor Hughes, dated April 24, 1968, directs that you revoke the permission heretofore given to Mr. Bailey to appear as counsel in the Kavanaugh and related matters unless the said Bailey or his client shows cause satisfactory to you to permit him to remain as counsel in said matters.

A hearing to that end is to be held by you forthwith. At such hearing, you shall make inquiry as to the extent of the distribution of said letter and counterparts thereof addressed to others. The foregoing is independent of such action as the Supreme Court may itself take with respect to a permanent bar of Mr. Bailey from appearing in the courts of New Jersey or other discipline."

Our directive was communicated by telephone to Judge Brown who on the same day wrote and wired Mr. Bailey:

"You are hereby directed to appear forthwith at my courtroom for an *in camera* hearing as to the authorship and distribution of a letter to Governor Hughes dated April 24, 1968. Your clients, Harold Matzner and Dorothe Krueger must also attend together with Mr. Afflitto."

Mr. Bailey responded on the wrong foot. He wired Judge Brown:

"Your directive telegram received this morning I have commitments for the balance of this week but will make myself available Friday morning at 10 A. M. Objection is hereby interposed to any further in camera proceeding in this case on the ground that were it not for violations of the First Amendment which have already occurred these indictments would have been disposed of as fraudulent by public officials not permitted to conceal their doings from the citizenry Requesting that full and fair hearing be held into No. 1 the causes for the postponement of the April 22 date and the representation by an authorized state official that the indictments would be dismissed if perjury were found to [2] whether such perjury was found and be [3] by whom it was suborned Detailed letter follows."

Mr. Bailey's letter, which followed, was in the same vein. Mr. Bailey recognized that "You, of course, have a right to inquire as to deliberate news releases, and I assume that any hearings be limited to that issue." He added a request that the hearing also embrace the truth of essentially the same charges contained in his letter of April 24 to the Governor, to which subject we will refer later.

The hearing before Judge Brown was held on May 3, the date Mr. Bailey suggested in his telegram. The relevant issues were: (1) whether Mr. Bailey wrote the letter and intended the letter to reach the news media or acted with reckless indifference to that prospect; (2) if he did, whether cause nonetheless existed to permit him to continue at our Bar in those cases, which would involve (a) the prospects for Mr. Bailey's proper behavior, and (b) the impact upon Mr. Bailey's clients of the loss of his services.

As to the first, the hearing eliminated any possible doubt concerning Mr. Bailey's intent and expectation. He presented his secretary's affidavit, which revealed that originals of the letter of April 24 were sent by certified mail to:

The Governor of New Jersey

Attorney General of New Jersey

United States Attorney for the District of New Jersey

President of the New Jersey Bar Association

Attorney General of the United States

and that copies of the letter to the Governor went to:

All Assemblymen
All State Senators
All United States Congressmen
All United States Senators
16 members of the American Polygraph Association.

Mr. Bailey said he thought that not all of the members of the Congress received the letter but only those from the State of New Jersey. That limitation accepted, the letter went to more than 150 persons.

It escapes us how a lawyer could believe that those recipients, severally or collectively, could make a dispositive finding of the truth of his charges in time to obviate the impending trial of the indictment, or that any of them, if able so to do, would thus interfere with a matter before the judiciary on the basis of charges by him. Nor can we credit Mr. Bailey's amazement that someone turned the letter over to a reporter. Before us, Mr. Bailey admitted that he did not caution the recipients against that course, and offered the curious explanation that he felt secure in that regard because, by reason of the law of libel, no one who received the letter would release it and no news media would use it. Finally we note that although Mr. Bailey says he consulted other counsel in this case with respect to whether the courts of our State would entertain a proceeding by a defendant to compel a dismissal of an indictment, he conceded before us that he consulted none of them — not even Mr. Afflitto, who was counsel of record for his clients — before sending the letter of April 24. We think Mr. Bailey sensed that none of them would have countenanced that course.

Hence we do not have the slightest doubt that Mr. Bailey intended that letter to reach the press. Nor did anything emerge at the hearing to dissipate the gross ethical impropriety evident in the letter itself. On the contrary the hearing demonstrated that the letter also violated a specific order of the trial court. Less than two months before, Judge Brown had forbidden in explicit terms any public

disclosure of the alleged results of polygraph tests. The occasion was the filing of a motion in February 1968 concerning the admissibility at trial of polygraph tests. The motion having been filed with the Clerk of the Court, it became available to the press. Attached was an affidavit asserting that Mr. Bailey's clients had been given such tests, with of course the oblique intimation that they passed. The press carried the story. As a result, Judge Brown, on February 28, 1968, warned all counsel:

> "If there is any further reference in any form by a lawyer in either of these cases to a specific polygraph or lie detector test before a ruling by the Supreme Court that such a so-called test is a reliable indication of truth, the conduct will be prosecuted as contempt of court."[2]

Nonetheless the letter of April 24 states the alleged results of alleged polygraph tests.

As we mentioned above, one of the relevant issues at the hearing was whether Mr. Bailey could give assurance as to future behavior if permitted to stay in the cases. On that score, Mr. Bailey's performance offered no promise. He apparently elected to attack. We have already referred to his telegram to Judge Brown which adhered to the theme of the letter of April 24. Of our directive under which Judge Brown was holding the hearing, Mr. Bailey said:

> "Now, I will state for the record right now, although I object to doing it in chambers, because I have not been given the privilege of chambers insofar as that rotten letter from your Supreme Court, rotten only because it was distributed to the news media. * * *"

---

[2] Our cases, and quite uniformly the decisions elsewhere, exclude the results of such tests for the reason that, however useful they may be as investigational tools, they are too unreliable for the courtroom. *State v. Driver*, 38 *N. J.* 255, 260 (1962); *State v. Walker*, 37 *N. J.* 208, 214–216 (1962), *certiorari* denied, 371 *U. S.* 850, 83 *S. Ct.* 89, 9 *L. Ed.* 2d 86 (1962); *State v. LaRocca*, 81 *N. J. Super.* 40 (*App. Div.* 1963); *State v. Arnwine*, 67 *N. J. Super.* 483 (*App. Div.* 1961); Annotation, 23 *A. L. R.* 2d 1306, 1308 (1952); see, *Wigmore, Evidence* (3d ed. 1940), § 999, *p.* 645; *McCormick, Evidence* (1954), § 174, *p.* 369.

Later he added:

"The risk of publication is always present if I sent one letter to the attorney general. I gather from the conduct of your Supreme Court that it is entirely proper to publish communiques. They have set a shining example, so I don't know why anybody takes the time to criticize me. * * *"

Thus Mr. Bailey apparently conceives that his extrajudicial utterances are on a par with the orders of this Court insofar as public information is concerned.

Nor could Mr. Bailey see any possible fault on his part with respect to the publication. The blame had to be elsewhere, and, as he put it, with some "politician." The transcript reads:

"THE COURT: With that many copies out are you really surprised that one fell into the hands of the press?
MR. BAILEY: Yes, I am. A politician decided to release it. Is it relevant who did that? Was it the Governor?
THE COURT: Was it foreseeable?
MR. BAILEY: I don't think that it was foreseeable and if that were foreseeable it would be irrelevant."

Finally, after Judge Brown gave his decision, Mr. Bailey said:

"All right, Judge, just in case your order should stick let me ask you something. How do you feel at this point? I ask you in front of these clients. Aren't you a little bit disgusted with yourself for having made up that ruling knowing that I have not violated your orders? You took an oath like I did. * * *"

Before us, taken to task for his reference to our "rotten" order, and for the incredible insult to Judge Brown just quoted, Mr. Bailey did apologize in those respects. But what did not come through was any sense of fault or contrition with respect to his letter of April 24. At the very end of the argument before us, he still placed the blame elsewhere, saying that "if I had to do it over again, I would not

send copies to Assemblymen because it is now demonstrated that this is a leak I did not then anticipate."

The final relevant aspect of the matter relates to the impact of Mr. Bailey's removal upon his clients, the intervenors, and their respective counsel. We have no doubt the removal of Mr. Bailey will have an appreciable impact upon all of them in some respect. The intervenors press their desire for a prompt trial, and their counsel, having arranged their calendars in the light of the expected trial date, undoubtedly are personally injured by a postponement. But a postponement is unavoidable even if Mr. Bailey remained, and this because of Mr. Bailey's misbehavior. The State believes Mr. Bailey's letter interferes with its right to a fair trial, and we cannot discount that fear. Indeed the ensuing publicity may well hurt all defendants if a trial were held at this moment.

Further, it may be that the Prosecutor will have to assign new counsel because of the events referred to in Mr. Bailey's letter of April 24. As there reflected, a key witness for the State with respect to the indictment scheduled for trial retracted an earlier statement, but thereafter withdrew the retraction. The retraction was obtained by Mr. Dowd, who had been engaged specially by the County Prosecutor to try the case. If the witness continues to disavow the retraction, there doubtless will be explored at trial the events which transpired between the witness and Mr. Dowd. Thus Mr. Dowd may have to testify. It is against our policy for an attorney to try a case when he knows he will probably be a witness. The reasons are obvious. The Prosecutor should make a decision forthwith, in the light of all the facts known to him, as to whether Mr. Dowd must step aside, and if he must, as seems likely, there will be a second reason why the contemplated trial will have to be delayed.[2a]

Since the trial must be postponed, there will be a full opportunity for Mr. Bailey's clients to obtain other counsel.

---

[2a] Since the preparation of this opinion we learned that Mr. Dowd and his associate, Mr. McGlynn, have resigned their appointments.

No doubt, as defendants say, the investigation has been extensive, but it remains the kind of a case that another lawyer can readily grasp. The investigation to date, which must be quite complete, is and will be available. A delay undoubtedly involves financial hurt, but the damage was done by Mr. Bailey when he sent his letter of April 24. As to the extra dollar hurt to Mr. Bailey's clients, involved in changing counsel, the matter must be left for an accounting between them.

It is not easy for us to oust counsel of a client's choice. But the misbehavior here is so gross that we cannot risk more of it. We have searched for some evidence that Mr. Bailey would stay in bounds, but unhappily we cannot find it. There must be a fair trial, both for a defendant and for the State. The conduct here involved invaded that interest. But of even greater moment than the interest of the immediate parties is the interest of the public in the integrity of the judicial process. The antics here involved spill over upon the right of all litigants to expect justice in the courtroom and in accordance with the rules of law. We have weighed again and again whether that larger interest could be served by a subsequent disciplinary proceeding alone, and we are constrained to find that it would not. We must therefore affirm the order.

We should speak of some other matters which were advanced but are not involved.

Mr. Bailey's clients urge a constitutional right to select an attorney who is not a member of our Bar. So long as the Bar of our State is able, willing and free to provide effective counsel, there is no such right. *Thomas v. Cassidy,* 249 *F. 2d* 91 (4 *Cir.* 1957), *certiorari* denied, *Fitzgerald v. Cassidy,* 355 *U. S.* 958, 78 *S. Ct.* 544, 2 *L. Ed. 2d* 533 (1958); *People of State of New York v. Epton,* 248 *F. Supp.* 276 (*S. D. N. Y.* 1965); see *Parker v. Parker,* 97 *So. 2d* 136 (*Dist. Ct. App. Fla.* 1957); *Johnson v. DiGiovanni,* 347 *Mich.* 118, 78 *N. W. 2d* 560, 565 (*Sup. Ct.* 1956). This is not a situation in which no member of the local Bar will

act. See *Lefton v. City of Hattiesburg, Mississippi,* 333 *F. 2d* 280 (5 *Cir.* 1964). There is no dearth of competent attorneys in our State ready to meet the constitutional right to counsel. There is nothing provincial about the requirement for admission to practice in the courts of a State. The courts of every jurisdiction must have control of practice before them as an "incident to their broader responsibility for keeping the administration of justice and the standards of professional conduct unsullied." *Cohen v. Hurley,* 366 *U. S.* 117, 123–124, 81 *S. Ct.* 954, 958, 6 *L. Ed. 2d* 156, 162 (1961).[3]

Defendants refer to *United States v. Bergamo,* 154 *F. 2d* 31 (3 *Cir.* 1946), but that case dealt with practice in the federal courts. This was made clear in *Cooper v. Hutchinson,* 184 *F. 2d* 119 (3 *Cir.* 1950), where the same court described as "startling" the suggestion that the courts of the States are bound to permit out-of-state attorneys to practice before them (*p.* 122). The *Cooper* case goes no further than to say that a constitutional issue is projected if an attorney admitted *pro hac vice* is removed in midstream for no reason at all and without a chance to be heard. See *Laughlin v. Eicher,* 79 *U. S. App. D. C.* 266, 145 *F. 2d* 700 (*D. C. Cir.* 1944), *certiorari* denied, 325 *U. S.* 866, 65 *S. Ct.* 1403, 89 *L. Ed.* 1985 (1945); *United States v. Madsen,* 148 *F. Supp.* 625, 16 *Alaska* 651 (*D. Alaska* 1957).

Nor is there involved the right to complain to other officers of the State or to officers of the Federal Government. Mr. Bailey was free to write to anyone in the world. What he could not do was to write with the intent, or with a reckless disregard of the high probability, that his letter would enter the public domain if the letter would violate the ethical concepts stated in Canon 20 and expounded in *State v. Van Duyne,* 43 *N. J.* 369 (1964), *certiorari* denied, 380 *U. S.* 987, 85 *S. Ct.* 1359, 14 *L. Ed. 2d* 279 (1965). We ex-

---

3 Overruled in other respects, *Spevack v. Klein,* 385 *U. S.* 511, 87 *S. Ct.* 625, 17 *L. Ed. 2d* 574 (1967).

pressly noted that the restraints applied as well to the defense (*p.* 389):

"The ban on statements by the prosecutor and his aides applies as well to defense counsel. The right of the State to a fair trial cannot be impeded or diluted by out-of-court assertions by him to news media on the subject of his client's innocence. The courtroom is the place to settle the issue and comments before or during the trial which have the capacity to influence potential or actual jurors to the possible prejudice of the State are impermissible."

These views had to be known to Mr. Bailey, who appeared in *Sheppard v. Maxwell,* 384 *U. S.* 333, 361, 86 *S. Ct.* 1507, 1521, 16 *L. Ed. 2d* 600, 619–620 (1966), where the Court said:

"More specifically, the trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters, such as the refusal of Sheppard to submit to interrogation or take any lie detector tests; any statement made by Sheppard to officials; the identity of prospective witnesses or their probable testimony; any belief in guilt or innocence; or like statements concerning the merits of the case. See State v. Van Duyne, 43 N. J. 369, 389, 204 A. 2d 841, 852 (1964), in which the court interpreted Canon 20 of the American Bar Association's Canons of Professional Ethics to prohibit such statements."

and further (384 *U. S.,* at *p.* 363, 86 *S. Ct.,* at *p.* 1522, 16 *L. Ed. 2d,* at *p.* 620):

"\* \* \* The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures."

Mr. Bailey's affront did not arise out of the fact that he wrote to the public officers or even to members of the American Polygraph Society. He misbehaved because he beamed the communication to the public.

 Finally, we refer to Mr. Bailey's claim that he had been advised by other counsel in the case that there was no proceeding for the enforcement of his clients' alleged rights. Of course, if there were a right to relief, our courts would be open. We gather that what other counsel said was that there was no basis for relief, rather than lack of remedy, when the claimed grievance is necessarily involved in the trial of the indictment itself. Ordinarily, of course, that must be true, for there is no reason for a "pretrial" trial of the truth of the indictment, to say nothing of the problem that practice would involve if the "pretrial" trial should result in a finding, express or implied, that the defendant is guilty. And if Mr. Bailey meant that counsel told him there was no basis for a claim of a "contract" to *nolle pros,* again the advice would be correct since it is fundamental in our State that no indictment may be *nolle prossed* without the approval of the court. *R. R.* 3:11–3(a); *State v. Ashby,* 43 *N. J.* 273 (1964). That, incidentally, is the federal rule as well. *Fed. R. Crim. P.* 48(a). But none of this is at all relevant.[4] Mr. Bailey's misbehavior did not lie in bringing a frivolous motion or instituting a frivolous suit. He did no such thing. On the contrary, he went to the mass media at a time and in terms which interfered with the fair trial of a matter before the judiciary. For this reason, Judge Brown correctly refused to be diverted by Mr.

---

4 In the federal proceeding, the court permitted Mr. Bailey to place Mr. Dowd and his associate, Mr. McGlynn, on the stand to explore conversations with Mr. Bailey and also their beliefs or state of mind with respect to the State witness who recanted. The United States District Court permitted that examination to the end that the testimony would be available to us on this appeal for whatever mitigating effect it may have. Defendants offered the transcript. We, however, declined to accept it. The examinations of Mr. Dowd and Mr. McGlynn seemed incomplete, and probably because the Attorney General declined to participate in that interrogation. In any event, on the facts, as we find them, nothing said by Mr. Dowd or Mr. McGlynn or intimated by Mr. Bailey in his examination of them could explain or palliate the misconduct.

Bailey's request that there be tried the truth of his charges in his letter of April 24.

The order is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.