IN THE MATTER OF JOEL I. RACHMIEL, AN ATTORNEY AT LAW.

Argued February 9, 1982—Decided August 4, 1982.

*Joel I. Rachmiel* argued the cause *pro se.*

*Colette A. Coolbaugh,* Secretary, argued the cause for complainant Disciplinary Review Board.

The opinion of the Court was delivered by

HANDLER, J.

In this case, as in the companion case of *In the Matter of Lennox Hinds,* 90 *N.J.* 604 (1982), also decided today, we must determine the constitutionality of certain disciplinary rules regulating the extrajudicial speech of attorneys. The primary disciplinary rule involved bars an attorney associated either with the prosecution or defense of a criminal case from commenting on the guilt or innocence of the accused, the evidence or the merits of the case. *DR* 7–107(B)(6). We must now determine the free speech standards to be applied and the nature of the associational relationships required to invoke this disciplinary rule.

# I

Joel I. Rachmiel is a New Jersey attorney admitted to practice law in this State since 1973. From December 1973 to March 1979, Rachmiel worked as an assistant prosecutor in the Union County Prosecutor's Office. In that capacity he prosecuted George Merritt, accused of killing a policeman during the Plainfield riots of 1967. The 1977 trial in which Rachmiel served as prosecutor represented the third time that Merritt had been tried for the murder, his first two convictions having been overturned on appeal. In this third trial Merritt was once again convicted of first degree murder, and the conviction was affirmed on appeal. *State v. Merritt*, No. _____ (App.Div.1978), certif. den., 81 *N.J.* 278 (1979). However, in a subsequent federal action the United States District Court granted Merritt a writ of habeas corpus because the State had failed to inform the defense of the existence of a police report that contradicted the trial testimony of the State's only eyewitness to the killing. *United States v. Hicks*, No. 79–2194 (D.N.J. Feb. 20, 1980).

By that time the case of George Merritt had attracted national, even international, attention.[1] The Union County Prosecutor's Office was faced with the difficult decision of whether to retry Merritt for an unprecedented fourth time. It was at this point that Rachmiel, by then in private practice, chose to speak out about the case and the desirability of a fourth trial.

Immediately after Merritt's conviction was overturned, Rachmiel was contacted by a reporter from the *Courier-News.* Rachmiel told the reporter that he thought Merritt should be retried. In an article dated February 22, 1980, and entitled, "Profs: Retrial of Merritt questionable," the *Courier-News* gave the following account of Rachmiel's remarks:

---

[1] The *Merritt* case reached the pages of both *Harper's Magazine* and the *National Law Journal*. Moreover, on January 15, 1978, *Pravda*, the Soviet Union's most prominent daily newspaper, ran a feature story entitled, "The Case of George Merritt."

Former Union County Assistant Prosecutor Joel Rachmiel, who prosecuted the state's case against Merritt in the third trial in 1977, said yesterday he believed the state should go for a fourth trial. "This involved the ruthless murder of a police officer," Rachmiel said.

\* \* \* \* \* \* \* \*

Rachmiel maintained that "because there is a reversal does not mean that the man is innocent. It just means that there is additional evidence that a jury should consider."

Rachmiel pointed out that the courts that overturned Merritt's three convictions "have never seen [the prosecutor's eyewitness] testify at trial. Thirty-six jurors have seen fit to believe his testimony entirely," he said. "I think it is unfair for someone to read a cold transcript and judge from that."

However, on February 25, 1980, Rachmiel distributed to the press a "letter to the editor," stating that he was now of the view that Merritt should not be retried. He did this without consulting his former employer, the Union County Prosecutor.

Several publications ran stories quoting from the Rachmiel release. See, *e.g.*, the *National Law Journal*, "Missing File Frees Con in Murder Case," March 12, 1980; *Newark Star-Ledger*, "Clarification on Statement," March 1, 1980; the *Daily Journal*, "Decision Due on 4th Trial," Feb. 28, 1980. Representative of these reports was an article in the *Courier-News* dated February 26, 1980, and entitled, "Ex-Prosecutor Shifts on Merritt." The story read, in pertinent part:

The former assistant prosecutor said that while he hasn't changed his belief regarding Merritt's participation in the mob beating of Patrolman John Gleason, he realizes "there is little to be gained in pursuing another prosecution, since, no matter what the ultimate verdict, all that can be claimed is a mere hollow moral victory for one side or the other."

"Society's traditional needs for punishment, deterrence, retribution and rehabilitation can no longer justify any further continuation of this affair," Rachmiel said. "There has already been too much suffering in the long history of events since 1967, both by Merritt and his family, as well as by the widow, three children and family and friends of Officer Gleason."

Rachmiel said he thought Merritt wasn't the criminal type but was caught up in the emotions of the time. "The need for rehabilitation, if any were ever necessary, has long ago been satisfied," Rachmiel said. "Society need not fear George Merritt, nor should we seek any further revenge against him. For he has shown during his periods of freedom that he is anxious to return to his family and friends and once again become a productive and law abiding citizen.

"Scholars may long debate the issue, but 13 years and the rigors of three trials are as much as any man should have to endure, guilty or not."

During this same period Rachmiel also granted interviews to Larry Bodine of the *National Law Journal* and Seymour Wishman, a New Jersey attorney writing an article about the Merritt case for *Harper's Magazine*. Rachmiel told Wishman that Merritt had initially requested a lie detector test before his third trial but then refused to take it, and that Merritt was offered a plea of second degree murder but declined the offer.

At the time Rachmiel made these statements, the Union County Prosecutor's Office was still deciding whether to retry Merritt. On April 24, 1980, that office moved to dismiss the indictment, sparing Merritt a fourth trial.

Just prior to that decision, the county prosecutor forwarded an ethics complaint to the Union County District Ethics Committee (now the District XII Ethics Committee).[2] The committee issued a formal complaint against Rachmiel and held hearings. At those hearings Rachmiel admitted that he had prepared and distributed the release to the press and had made the statements attributed to him. He denied divulging any confidential information, claiming that the press had already reported Merritt's refusal to take a polygraph examination and that the prosecutor himself had publicly discussed the possibility of a plea bargain.[3]

On December 30, 1980, the committee filed a presentment charging Rachmiel with violating Disciplinary Rules 1-102(A)

---

[2]This was not the first time that Rachmiel had faced possible sanctions for inappropriately speaking out on a case. In July 1978, a cursory investigation was conducted concerning Rachmiel's public statements during ongoing grand jury deliberations. The ethics investigation ceased after Rachmiel explained that he had been misquoted and, ironically, the prosecutor assured the investigator that Rachmiel had always been extremely discreet.

[3]In an article appearing in the *Bergen Record* on September 24, 1978, it was reported that "Merritt says now he'll take a lie-detector test (not normally admissible in court) to prove his story; prosecutors say he rejected earlier invitations to take a test." Rachmiel said that he was told by Wishman that the prosecutor had discussed the possibility of a plea bargain during one of their conversations.

(1), 1–102(A)(5), 4–101, 7–107(B)(6) and 7–107(E). *DR* 1–102(A)(1) states that "a lawyer shall not ... [v]iolate a Disciplinary Rule." *DR* 1–102(A)(5) sanctions attorneys for "[e]ngag[ing] in conduct ... prejudicial to the administration of justice." *DR* 4–101(B)(1) states that "a lawyer shall not knowingly ... [r]eveal a confidence or secret of his client." *DR* 7–107(B)(6) reads:

A lawyer or law firm associated with the prosecution or defense of a criminal matter shall not make or participate in making an extrajudicial statement that he expects to be disseminated by means of public communication and that relates to ... [a]ny opinion as to the guilt or innocence of the accused, the evidence, or the merits of the case.

And *DR* 7–107(E) states:

After the completion of a trial or disposition without trial of a criminal matter and prior to the imposition of sentence, a lawyer or law firm associated with the prosecution or defense shall not make or participate in making an extra-judicial statement that he expects to be disseminated by public communication and that is reasonably likely to affect the imposition of sentence.

Rachmiel appealed to the State Disciplinary Review Board, seeking a dismissal of the presentment. He argued that the State's disciplinary rules proscribing attorney out-of-court statements are unconstitutionally vague and overbroad. He further contended that his public comments violated no client confidence (the client in this case being the State of New Jersey).[4]

On July 30, 1981, the Board issued a 5–2 decision, holding Rachmiel in violation of all the rules charged and recommending a public reprimand. The majority refused to address Rachmiel's constitutional challenges, concluding that the Board was without authority to make such determinations. The dissent addressed the constitutional issue to the extent that it found it "doubtful that *DR* 7–107(B) will be able to withstand judicial scrutiny." It further found that Rachmiel's statements had no effect upon the administration of justice and were made at a time when

---

[4]Rachmiel also moved for a postponement of any action on the presentment until the federal courts reached a decision in Hinds' federal case, *Garden State Bar Association v. Middlesex County Ethics Committee.* See *Hinds,* 90 *N.J.* at 611 -613. The Disciplinary Review Board denied that motion.

Rachmiel was no longer actively associated with the case. Therefore, the dissent concluded that while Rachmiel's conduct was unwise, it did not constitute a violation of the State's disciplinary rules.

On December 17, 1981, this Court ordered Rachmiel to show cause why he should not be disciplined for his conduct.

## II

Rachmiel was found guilty of violating four disciplinary rules. The disciplinary rule which most clearly and directly covers Rachmiel's statements is *DR* 7–107(B)(6), which proscribes attorneys involved in criminal cases from making statements that relate to "[a]ny opinion as to the guilt or innocence of the accused, the evidence, or the merits of the case."[5] Rachmiel contends that the application of *DR* 7–107(B)(6) to the comments which he made about the Merritt trial would violate his First Amendment right of free speech. We reject these arguments for the reasons set forth in *Hinds*.

In determining the validity of restrictions upon free speech, the constitutional analysis calls for the application of two demanding tests. The first is whether a substantial govern-

---

[5]*DR* 7–107(B) provides as follows:

A lawyer or law firm associated with the prosecution or defense of a criminal matter shall not make or participate in making an extra-judicial statement that he expects to be disseminated by means of public communication and that relates to:

(1) The character, reputation, or prior criminal record (including arrests, indictments, or other charges of crime) of the accused.

(2) The possibility of a plea of guilty to the offense charged or to a lesser offense.

(3) The existence or contents of any confession, admission, or statement given by the accused or his refusal or failure to make a statement.

(4) The performance or results of any examinations or tests or the refusal or failure of the accused to submit to examinations or tests.

(5) The identity, testimony, or credibility of a prospective witness.

(6) Any opinion as to the guilt or innocence of the accused, the evidence, or the merits of the case.

mental interest is furthered by the restriction upon speech. *Procunier v. Martinez*, 416 *U.S.* 396, 413, 94 *S.Ct.* 1800, 1811, 40 *L.Ed.*2d 224, 240 (1974). The second requires that the restriction be no greater than is necessary or essential to protect the governmental interest involved. *Id.* The application of these tests involves a balancing of the gravity and likelihood of the harm that would result from unfettered speech against the degree to which free speech would be inhibited if the restriction is applied. *Nebraska Press Association v. Stuart*, 427 *U.S.* 539, 562, 96 *S.Ct.* 2791, 2804, 49 *L.Ed.*2d 683, 699 (1976), citing *United States v. Dennis*, 183 *F.*2d 201, 212 (2 Cir. 1950) (Hand, J.), aff'd, 341 *U.S.* 494, 71 *S.Ct.* 857, 95 *L.Ed.* 1137 (1951).

We conclude in this case, as we did in *Hinds*, that the restriction upon free speech imposed by the disciplinary rule addresses a substantial governmental interest. That interest relates to the fairness and integrity of the administration of justice and becomes particularly compelling in the administration of the criminal justice system. *Hinds*, 90 *N.J.* at 615. See *State v. Kavanaugh*, 52 *N.J.* 7, *cert.* den., 393 *U.S.* 924, 89 *S.Ct.* 254, 21 *L.Ed.*2d 259 (1968); *State v. Van Duyne*, 43 *N.J.* 369 (1964), *cert.* den., 380 *U.S.* 987, 85 *S.Ct.* 1359, 14 *L.Ed.*2d 279 (1965); *Middlesex Ethics Comm. v. Garden St. Bar Ass'n,* —— *U.S.* —— at —— – ——, 102 *S.Ct.* 2515 at 2522–2523, 73 *L.Ed.*2d 116 (1982); *Sheppard v. Maxwell,* 384 *U.S.* 333, 86 *S.Ct.* 1507, 16 *L.Ed.*2d 600 (1966). The rule in question furthers a substantial governmental interest in that it attempts to restrict speech that would be prejudicial or deleterious to the administration of criminal justice.

We must next determine whether this restriction extends no further than is necessary and essential to further that substantial interest. Rules restricting freedom of speech must be neither vague nor overbroad. *Hinds*, 90 *N.J.* at 617–618. The "void for vagueness" doctrine comes into play when statutory prohibitions are not clearly defined. *Grayned v. City of Rockford*, 408 *U.S.* 104, 108–09, 92 *S.Ct.* 2294, 2299, 33 *L.Ed.*2d 222, 227–28 (1972). The vagueness doctrine involves

procedural due process considerations of fair notice and adequate warning. *State v. Lashinsky,* 81 *N.J.* 1, 17–18 (1979). See *Smith v. Goguen,* 415 *U.S.* 566, 573, 94 *S.Ct.* 1242, 1247, 39 *L.Ed.* 2d 605, 612 (1974). The doctrine of overbreadth focuses primarily on whether the restriction, even if clearly articulated, encompasses more than is absolutely necessary and essential to protect the governmental interest. *Hinds,* 90 *N.J.* at 618; *Grayned,* 408 *U.S.* at 115, 92 *S.Ct.* at 2302, 33 *L.Ed.*2d at 231. Thus, overbreadth involves substantive due process considerations of excessive governmental intrusion into protected areas, while vagueness implicates concerns of procedural due process relating to fair warning. *Hinds,* 90 *N.J.* at 618; *Lashinsky,* 81 *N.J.* at 17–18.

The ethical rule at issue in this case imposes restraints upon a limited class of persons—attorneys for the prosecution or defense in a pending criminal matter. These persons have a unique role and responsibility in the administration of criminal justice and, therefore, have an extraordinary power to undermine or destroy the efficacy of the criminal justice system. *Hinds,* 90 *N.J.* at 615–616, 623–624; *Middlesex Ethics Comm., —— U.S.* at ——, 102 *S.Ct.* at 2522–2523; *Goldfarb v. Virginia State Bar,* 421 *U.S.* 773, 792, 95 *S.Ct.* 2004, 2016, 44 *L.Ed.*2d 572, 588 (1975). For the reasons stated in *Hinds,* such attorneys are appropriately subject to carefully tailored restraints upon their free speech.

*DR* 7–107(B) enumerates a number of subjects in particularly sensitive areas, about which attorneys associated with a pending criminal case are not to comment publicly. See *supra,* 90 *N.J.* at 654, n.5. As a blanket prohibition, these restraints would be unconstitutionally overbroad. *Hirschkop v. Snead,* 594 *F.*2d 356, 363–68 (4 Cir. 1979) (en banc); *Chicago Council of Lawyers v. Bauer,* 522 *F.*2d 242, 251 (7 Cir. 1975), cert. den., sub nom. *Chicago Council of Lawyers v. Cunningham,* 427 *U.S.* 912, 96 *S.Ct.* 3201, 49 *L.Ed.*2d 1204 (1976). However, when read in conjunction with the other sections of *DR* 7–107, all of

which apply only to that speech which is "reasonably likely" to interfere with a fair trial, the proper scope of this provision becomes clear.

■ We construe *DR* 7–107(B)(6) as imposing the reasonable likelihood test for determining the nature and scope of this restriction upon free speech. *Bauer*, 522 *F.*2d at 251, 254–55. So interpreted, *DR* 7–107(B)(6) prohibits an attorney involved in an ongoing criminal trial from making extrajudicial comments concerning the guilt or innocence of a criminal defendant or the quality of the evidence or the merits of the case when such remarks are intended to be publicly disseminated and are reasonably likely to interfere with a fair trial. By articulating particular subjects about which attorneys associated with a criminal case should not comment, the rule, in effect, creates a rebuttable presumption that statements on these topics are reasonably likely to affect the proceedings. *Bauer*, 522 *F.*2d at 251. Once it is established that the statement made was of this type, the burden would then be upon the charged party to rebut that presumption.[6] *Id.*

■ For the reasons enunicated in *Hinds*, we are satisfied that the constitutional mandate of the First Amendment does not compel a stricter test such as "clear and present danger" or "serious and imminent threat" of prejudice. The State's strong concern and society's great interest in the proper administration of the criminal justice system cannot be overemphasized. Judicial fairness, integrity and efficacy are sufficiently important objectives to justify a speech restriction that seeks to insure that criminal proceedings will not be frustrated or undermined. *Hinds*, 90 *N.J.* at 615.

---

[6]We emphasize that this approach does not involve any shifting of the ultimate burden of proof. The complainant would still have to prove by clear and convincing evidence that the charged party committed an ethical violation. *In re Pennica*, 36 *N.J.* 401, 418–19 (1962). The presumption would simply serve to shift the burden of production to the charged party, who would then have to come forward with evidence to rebut the presumption. See *Griggs v. Bertram*, 88 *N.J.* 347, 366–67 (1982).

■ There can be no doubt that, in terms of subject matter, Rachmiel's statements fall within the purview of *DR* 7–107(B)(6). We cannot minimize the fact that Rachmiel's remarks were highly improper. He spoke openly about the guilt of the defendant, the quality of the evidence and the merits of the case. As a former assistant prosecutor who had actually presented the case, his statements were particularly telling. The special difficulty posed in this case, however, is whether the record permits a determination that by clear and convincing evidence Rachmiel's remarks were reasonably likely to interfere with the criminal proceedings. The proper test for determining whether Rachmiel's statements were reasonably likely to affect trial fairness is the balancing approach which we have articulated for the first time in today's *Hinds* decision. 90 *N.J.* at 622–623. All relevant factors must be considered, including the nature and timing of the statement, the context in which it was uttered, and the attorney's status in the case. *Id.* at 622. While the respondent has the burden of production, the complainant still has the ultimate burden of persuasion to demonstrate by clear and convincing evidence that the statements were reasonably likely to affect trial fairness.

In this case both the Ethics Committee and the Disciplinary Review Board concluded that Rachmiel violated *DR* 7–107(B)(6). However, neither tribunal had the benefit of the applicable balancing test when it assessed the facts and reached its ultimate decision. Under these circumstances, we cannot assume that the proper balancing test was actually applied or that had it been invoked, the same result would necessarily have been reached. Furthermore, there is no indication that the lower tribunals understood or properly dealt with the presumption of prejudice which we have posited in our opinion today as a component of the burden of proof in an ethics proceeding under *DR* 7–107(B)(6). *Supra* at 656.

■ In addition, Rachmiel contends that *DR* 7–107(B)(6) cannot be applied to him since he was no longer actively participat-

ing in the case and, in fact, was engaged in private law practice when he made his remarks. If the disciplinary rule were to be applied to him, it would, Rachmiel argues, be invalid on both vagueness and overbreadth grounds.

*DR* 7–107(B)(6) does not apply to speech uttered by ordinary citizens or even to lawyers in general or as a class. It applies only to "[a] lawyer or law firm associated with the prosecution or defense of a criminal matter." In *Hinds*, we interpreted a similar phrase in *DR* 7–107(D) as including not only an attorney of record charged with the actual representation of a party (there, the defendant) but any lawyer who is associated with attorneys of record in a regular, continuing and cooperative professional capacity and who publicly claims to be associated with the attorneys of record in the case. *Hinds*, 90 *N.J.* at 627–628.

This class of attorneys would logically and sensibly include someone like Rachmiel who had been an attorney of record in the case but, for whatever reason, was no longer participating in the litigation. Such an individual, once privy to confidential information about the case, cannot later violate those confidences merely because he is no longer officially participating in or otherwise actually "associated with" the case as an attorney. *Cf. DR* 7–107 (rule on client confidences applies with equal force after a case is terminated or the attorney-client relationship ceases). This is especially important in a case that has not been concluded. By virtue of his previous participation in the case as counsel for one of the parties, the attorney must be deemed to be associated with the case for as long as that case is continuing and his former client's interests have not been finally adjudicated or resolved. It would be contrary to the purpose of this rule to allow an attorney intimately involved in an ongoing case to comment openly about it simply because his association with the matter ceases before it is concluded.

Accordingly, we hold that *DR* 7–107(B)(6), in its application to attorneys of record who are no longer actively involved in an

ongoing case, is neither vague nor overbroad. Consequently, we reject the claim that application of this disciplinary rule to Rachmiel constitutes a violation of his right to free speech under the First Amendment.

■ Nevertheless, we decline to find Rachmiel in violation of *DR* 7–107(B)(6). This case is the first opportunity we have had to explain the balancing test and the presumption that must be invoked in determining what speech violates *DR* 7–107(B)(6). Also, our opinion today constitutes the first occasion on which we have determined that *DR* 7–107(B)(6) applies to attorneys who are no longer officially, formally, or functionally participating in a continuing criminal trial. We are engaged here not in the enforcement of the criminal laws but in the shaping of disciplinary rules, the purpose of which is to protect the public and to edify and improve the legal profession, rather than to punish. And just as important, the case involves speech, a matter of strong constitutional solicitude that should, only with the utmost reluctance, be the subject of disciplinary sanctions. See *Hinds,* 90 *N.J.* at 630.

We therefore deem it appropriate that *DR* 7–107(B)(6), as interpreted by us today, be given prospective effect only. *Hinds,* 90 *N.J.* at 628–630. Compare *In re Smock,* 86 *N.J.* 426 (1981), with *In re Wilson,* 81 *N.J.* 451 (1979). While we uphold the constitutionality of *DR* 7–107(B)(6), we conclude that, as a matter of fairness, Rachmiel should not be found guilty of violating this disciplinary rule. See *Hinds,* 90 *N.J.* at 629–630.

### III

■ The Disciplinary Review Board also found Rachmiel guilty of violating *DR* 7–107(E). That rule prohibits extrajudicial comments that are reasonably likely to affect the sentencing phase of a criminal proceeding. Aside from what other effects Rachmiel's statements had upon the disposition of George Merritt's case, these comments were not uttered during the sentenc-

ing phase. When Rachmiel expressed his views of the case, Merritt's conviction had been reversed. Merritt faced possible retrial, not sentencing. Hence, *DR* 7–107(E) is inapplicable in this instance.

█ Rachmiel was also found in violation of *DR* 4–101(B)(1), prohibiting an attorney from "[r]eveal[ing] a confidence or secret of his client." Specifically, Rachmiel is said to have told a reporter that Merritt refused to take a lie detector test and was offered a plea bargain which he refused.[7] Under the circumstances, we decline to find Rachmiel guilty of violating this disciplinary rule. Both of these supposed confidences had apparently already been revealed publicly. See *Bergen Record*, September 24, 1978 ("Merritt says now he'll take a lie-detector test . . . prosecutors say he rejected earlier invitations to take a test"). Rachmiel testified that he was told by attorney-writer Wishman that the prosecutor had openly discussed the possibility of a plea bargain. The State bears the burden of proving a disciplinary infraction by clear and convincing evidence. *In re Pennica*, 36 *N.J.* 401, 418–19 (1962). The evidence in this case does not constitute clear and convincing proof of an ethical violation. Therefore, we find that Rachmiel did not violate *DR* 4–101.

Rachmiel was also found guilty of violating two other disciplinary rules, *DR* 1–102(A)(5) and *DR* 1–102(A)(1).

The former proscribes "conduct [by an attorney] prejudicial to the administration of justice." We also addressed this rule in *Hinds*. We noted that since *DR* 1–102(A)(5) is not limited in its application to attorneys who are officially participating in or meaningfully associated with an ongoing criminal trial, such an

---

[7]These divulgences could be construed as violative of *DR* 7–107(B)(2), prohibiting attorneys from publicly discussing the "possibility of a plea to the offense charged or to a lesser offense," and of *DR* 7–107(B)(4), prohibiting attorneys from commenting on the "performance or results of any examinations or tests or the refusal or failure of the accused to submit to examinations or tests."

unrestricted application of the rule to speech would seem to require a stricter standard than the "reasonably likelihood" test to pass muster under the First Amendment. 90 *N.J.* at 632–633. Nevertheless, we are satisfied that the same notions of fairness and judicial policy that convinced us to find no violation by Rachmiel of *DR* 7–107(B)(6) also impel us to find no violation of *DR* 1–102(A)(5).

Finally, the determination that Rachmiel violated *DR* 1–102(A)(1) cannot survive in the absence of a finding that Rachmiel violated some other disciplinary rule. This rule, which provides that "[a] lawyer shall not ... [v]iolate a Disciplinary Rule," is purely derivative. It has no independent substantive strictures and cannot provide the basis for disciplinary sanctions if there are no separate ethical infractions. Since we have concluded that Rachmiel did not violate any other disciplinary rules in this instance, the violation of *DR* 1–102(A)(1) must also be set aside.

IV

Accordingly, the determination of the Disciplinary Review Board that Rachmiel violated Disciplinary Rules 1–102(A)(1), 1–102(A)(5), 4–101, 7–107(B)(6) and 7–107(E) is reversed and the presentment charging Rachmiel with ethical violations is dismissed.

SCHREIBER, J., dissenting.

The District XII Ethics Committee and the Disciplinary Review Board found the respondent had violated various disciplinary rules and the Disciplinary Review Board recommended a public reprimand. The facts were largely undisputed.

Respondent, an Assistant Prosecutor in Union County, represented the State in the trial of George Merritt. The conviction was affirmed on appeal and certification denied by this Court, 81 *N.J.* 278 (1979). However, the United States District Court granted Merritt a writ of *habeas corpus* and the Union County

Prosecutor's Office was faced with the decision of whether to retry Merritt.

Respondent, who was then in private practice, was interviewed by a reporter of the *Courier-News*. The interview was published. According to the article, respondent stated the case should be retried. He explained that a "ruthless murder of a police officer" was involved, that three prior juries consisting of thirty-six people had found Merritt guilty, that the courts which had reversed the prior convictions had never seen the prosecution's key eyewitness and that it was "unfair for someone to read a cold transcript and judge from that."

Several days later, after discussing the case with his wife, respondent drafted a press statement which he released to the *Courier-News*, the *Daily Journal*, the *Bergen Record* and the *Newark Star Ledger*. Each paper ran articles quoting him at length. Respondent's release stated that he had changed his mind and that the State should not retry Merritt. Respondent also advised certain reporters that Merritt had refused an offer to take a lie detector test and an offer to plead guilty to second degree murder.

The First Assistant Prosecutor who testified during the hearing before the Ethics Committee indicated that his office received many calls from community groups after respondent's statement was published urging that the Prosecutor not try Merritt again. The First Assistant Prosecutor believed that the publicity prejudiced the possibility of a new trial. The situation thereafter is best described by the Disciplinary Board:

> The Prosecutor's office was placed in a compromising situation because of the statements made by Mr. Rachmiel since the disciplinary rules precluded the Prosecutor from making any statement regarding the case. Additionally, it made the Prosecutor's decision as to the disposition of the matter more difficult because of the position previously outlined by the respondent. It also made it difficult to restrain other Assistant Prosecutors from making extrajudicial statements with regard to any cases they were handling. Lastly, because of the notoriety of this case the Prosecutor's Office was desirous that the clamor by certain pressure groups subside before they made a decision. At the time of the reversal of the conviction several choices were open to the Prosecutor, namely to appeal Judge Meanor's decision; to retry Merritt for the fourth time; not to

retry Merritt; to apply to the Assignment Judge for dismissal of the indictment, and lastly, there was a choice of engaging Merritt in plea bargaining. As the result of the respondent's familiarity with the case and his expressed feeling that the matter should not be retried, the Prosecutor was placed in a position where he was perhaps hampered in exercising some of the avenues previously open to him. However, the First Assistant Prosecutor stated that this did not influence the Prosecutor's decision. Until such time as the Prosecutor's Office officially determined whether to retry or dismiss the Merritt case, the matter remained open.

Respondent conceded that he would have not made these statements if he had been in the employ of the Prosecutor's Office at the time the reversal occurred.

The Disciplinary Review Board found violations of *DR* 1–102(A)(1) and (5), *DR* 7–107(B)(2), (4) and (6), *DR* 7–107(E), and *DR* 4–101(B)(1). I agree with the majority that there was no violation of *DR* 7–107(E) which involves statements likely to affect imposition of sentence. However, the record does establish violations of the remaining cited Disciplinary Rules.

Respondent has advanced two reasons why he is not subject to discipline. He contends that he was no longer associated with the prosecution when he issued the press releases despite the fact that he had prosecuted Merritt. This claim is specious. Respondent knew or should have known that information obtained as a prosecutor fell within the traditional framework of the attorney-client privilege. The purposes of these Disciplinary Rules do not depend on the status of the attorney at the time the public communication is disseminated. Termination of the attorney-client relationship did not justify his actions.

Respondent also claims that his comments were privileged by the First Amendment to the United States Constitution. As indicated by the majority, a lawyer is not always in the same position as other citizens with respect to his right of free speech. His freedom of speech may properly be limited because he is an "officer of the Court" and has a fiduciary relationship with his client.

Respondent was charged with violations of *DR* 7–107(B)(1), (2), (4) and (6). Those Rules read as follows:

(B) A lawyer or law firm associated with the prosecution or defense of a criminal matter shall not make or participate in making an extrajudicial

statement that he expects to be disseminated by means of public communication and that relates to:

(1) The character, reputation, or prior criminal record (including arrests, indictments, or other charges of crime) of the accused.

(2) The possibility of a plea of guilty to the offense charged or to a lesser offense.

. . . .

(4) The performance or results of any examinations or tests or the refusal or failure of the accused to submit to examinations or tests.

. . . .

(6) Any opinion as to the guilt or innocence of the accused, the evidence, or the merits of the case.

I concur in the majority's interpretation of these provisions requiring a showing that the communication be found to be reasonably likely to interfere with the administration of justice. I believe the record justifies such a finding. However, there is a possibility that respondent may not have produced some evidence in this respect and I would afford him that opportunity.

Moreover, I would judge respondent's conduct under *DR* 1–102(A)(5) under the standard stated in my dissent in *In the Matter of Lennox Hinds,* 90 *N.J.* 610, 643 (1982), namely, whether the communications were "prejudicial to the administration of justice."

It is incongruous that the majority dismisses this proceeding because it believes the District Ethics Committee and Disciplinary Review Board had not applied its "balancing test." Why not remand the case for that purpose? The other basis for dismissal is that this is "the first occasion on which we have determined that *DR* 7–107(B)(6) applies to attorneys who are no longer officially, formally, or functionally participating in a continuing criminal trial." *Ante* at 660. If we are to dismiss proceedings for this type of reason, we should be prepared to dismiss every case which is a "first occasion." The test should be whether the attorney was forewarned that the rule was or reasonably could be applicable to him. If in doubt he could have sought the opinion of the Advisory Committee on Professional Ethics. *R.* 1:19–2. A reading of the Disciplinary Rules in

advance of his communications to the public should have alerted him.

I would remand to the Ethics Committee for the parties to submit additional relevant evidence on the effect of the communications on the administration of justice.